ILLINOIS CENTRAL RAILROAD COMPANY *v.* WILLIAMS, et al.

No. 42068 December 18, 1961 135 So. 2d 831

*Walker & Thomson,* Starkville; *Jos. H. Wright, John W. Freels, Wence F. Cerne,* Chicago, for appellant.

*J. P. Coleman,* Ackerman, for appellees.

ETHRIDGE, J.

Mrs. Voyt Williams, Jr., individually and as next friend of her two minor children, brought this action in the Chancery Court of Choctaw County against appellant, Illinois Central Railroad Company, for the alleged wrongful death of complainants' husband and father, arising from a collision by Williams' car with a moving freight train of the defendant. Jurisdiction was obtained in Choctaw County by means of a nonresident attachment. The chancellor was the trier of facts. He found that the crossing was an unusually dangerous one; that the railroad had notice of that condition but failed to take any precautions; that Williams was contributorily negligent in driving at an excessive speed, but a proximate cause of his death was the railroad's failure, with notice, to take any adequate precautions for the public at this crossing. The decree awarded complainants damages in the sum of $60,000.

 █ Voyt Williams, Jr., was 28 years of age, with a life expectancy of 38.61 years. His wife was 25 years of age, and their son and daughter two years old and ten months old, respectively. He was well educated, with a master's degree in business administration from the University of Oklahoma. He served two years in the U. S. Air Force. At the time of his death he was managing partner (his father being the other partner) of Voyt's Renault Automobile Agency in Jackson. He was earning around $11,000 a year, and contributed at least $580 a month to the support of his wife and children in the year 1959. His father was in bad health, so after his death the business had to close. Under these circumstances there is no issue in this case of the excessiveness of damages. The railroad does not assert that. It contends principally that the sole, proximate cause of Williams' death was his own negligence in driving into a crossing already occupied by a moving freight train, at

an excessive speed and without taking proper precautions.

As an appellate court, our function on this appeal is to decide whether the chancellor, as the trier of facts, was manifestly wrong in his findings, or, stated differently, whether there was substantial evidence to support the decision of the chancery court. Griffith, Miss. Chancery Practice, Sec. 674. Since the chancellor resolved all conflicts in favor of the appellees, we must view the facts in the light most favorable to them, and consider as true all evidence in their favor, together with all reasonable inferences which may be drawn therefrom. Buford v. O'Neal, 128 So. 2d 553 (Miss. 1961). This is in accord with the many decisions of this Court so holding.

Another factor to be kept in mind is Mississippi's comparative negligence statute. Miss. Code 1942, Rec., Sec. 1454, provides: "In all actions hereafter brought for personal injuries, or where such injuries have resulted in death, or for injury to property, the fact that the person injured, or the owner of the property, or person having control over the property may have been guilty of contributory negligence shall not bar a recovery, but damages shall be diminished by the jury in proportion to the amount of negligence attributable to the person injured, or the owner of the property, or the person having control over the property."

Code Sec. 1455 further states, "All questions of negligence and contributory negligence shall be for the jury (trier of facts) to determine."

## I.

Complainants' theory of the case, adopted and applied by the trial court, is that the railroad company is liable for two reasons: (1) The Northside Drive crossing of appellant's railroad is more than ordinarily dangerous, requiring it to take more than ordinary precautions for

the safety of those attempting to cross, and, after full notice of such dangerous conditions, the railroad failed and refused to take adequate precautions. (2) The railroad was further negligent in failing and refusing to place lights at the crossing, as required by Sec. 1399 of the City of Jackson's Municipal Code of 1938. Appellees asserted, and the chancery court found, that these two factors constituted negligence, and were proximate causes of the death of appellees' intestate.

 The facts bring into consideration the so-called occupied crossing doctrine, and the peculiar or dangerous environment exception to it. A railroad has the right to occupy a crossing for its legitimate purposes, and, while so occupying it, the carrier is not required to maintain lights on its cars or to station a man with a lantern at the crossing to give warning that it is obstructed by cars, unless the conditions and circumstances are such that the employees of the railroad know, or in the exercise of reasonable care and caution should have known, that a person driving upon the highway at a reasonable rate of speed in an automobile properly equipped with lights, and carefully operated, could not see, or might not be able to see, the cars in time to avoid a collision with them. Gulf M. & N. R. R. Company v. Holifield, 152 Miss. 674, 120 So. 750 (1929). To fall within the exception stated in *Holifield,* there must be "some peculiar environment which renders the crossing unusually dangerous."

 The leading case in this State applying the exception to the rule is Boyd v. I. C. R. R. Company, 211 Miss. 409, 52 So. 2d 21 (1951). There it was pointed out that, where the evidence as to unusual danger and failure to take proper precautions is in dispute, questions of the railroad's negligence and contributory negligence of plaintiff are issues for decision by the trial court. 211 Miss. at 422. In *Boyd,* 211 Miss. at 414, 415, this Court said:

"In one or two of the cases cited by appellant it was stated that the presence of the car upon the crossing is all the notice which a traveler needs, but it must be at once apparent that such an expression has no application where the conditions and circumstances are such that reasonable care requires some further warning. If it were true that the mere obstruction of a crossing is sufficient notice that it is obstructed in each and every case, then there would never be any need for the exception and the exception would be a mere waste of words which are meaningless and of no avail in any case. In the Magers and McNeil cases, *supra,* this Court held in effect that the mere presence of an obstruction of a public crossing by the railroad was not sufficient notice of such obstruction where the conditions and circumstances were such that the jury would be warranted in finding that reasonable care required additional warning." See also Donald v. Gulf M. & O. R. R. Company, 220 Miss. 714, 71 So. 2d 776 (1954); Grand Trunk Railway Company of Canada v. Ives, 144 U. S. 408, 12 S. Ct. 679, 36 L. Ed. 485 (1891); 74 C. J. S., Railroads, Secs. 711, 725; 44 Am. Jur., Railroads, Secs. 502, 506, 507; Anno.

## II

The accident in which Voyt Williams, Jr., was killed occurred around 1 a. m. in the early morning of August 27, 1959. Northside Drive is a street which runs east and west near the northern boundary of the City of Jackson. The Y. & M. V. railroad line of appellant enters the city from the northwest and crosses Northside Drive going southeast. Defendant's train was moving across the street from the northwest to the southeast at an angle of 39 degrees, 5 seconds, which of course is considerably less than half of a right angle. It was a 91-car freight train, traveling 20 miles per hour. The crew was keeping a lookout, but no member of the crew saw decedent's automobile. Williams was driving from the east

going west. His lights and brakes were in good condition. The speed limit at this point was 30 miles per hour, but Williams was driving considerably in excess of that. He was not familiar with this crossing. The left front of his automobile collided with the left front corner of the forty-seventh car (a boxcar) of the appellant's train. This boxcar and others near it were unlighted. It was of a dark color. The crossing had no lights on it, except for what light was shed by a city street light located 104 feet west of the crossing and on the south side of Northside Drive.

There are a number of factors which the trial court could consider in determining whether this crossing was more than ordinarily hazardous or dangerous. Northside Drive is a heavily traveled street. Approximately 3,196 motor vehicles cross in every 24 hours, but in the early morning the traffic is relatively light. Since this accident occurred around 1 a. m., this fact, although not pertinent to the immediate circumstances of the accident, is relevant evidence on the issue of whether the crossing was unusually dangerous, and thus required unusual precautions.

More significantly, when a driver approaches a crossing from the east going west, the top of the railroad rail is elevated 16.52 feet above street level at a distance of 350 feet away. Moreover, the grade is varied, and the pavement is somewhat rough. An engineer's testimony indicated the variances in grade at different intervals. A car traveling 30 miles an hour would cross any of these intervals in approximately one-half of a second.

Patton, a civil engineer who testified for complainants, projected these figures. He said a direct beam of light projected from an automobile at 350-275 feet east of the crossing would strike 4.7 feet below the bottom of a boxcar occupying the crossing, and therefore one foot below the crossing. Without detailing lesser distances, it is sufficient to say that the trial court was

warranted in finding that a car had to get fairly close to the crossing before a direct beam from its headlights would strike the boxcar. The abruptly steep and varied incline of the street onto the high grade of the crossing presented a hazardous approach for an automobile at night. Unlighted freight cars were difficult to observe.

Since the railroad track crossed Northside Drive from northwest to southeast at an angle of thirty-five degrees, five seconds, visibility was reduced in this respect at least 22.3 per cent. An automobile headlight at this angle would not reflect between the boxcars.

West of the railroad and north of Northside Drive was situated the Rex Brown Electric Generating Plant of the Mississippi Power and Light Company. This is a generating facility with about nine large structures on it, including cooling towers and boiler units. From ground level to an elevation of 150 feet, these structures had on them 180 electric lights, totaling 37,100 watts. Testimony for complainants tended to show that the bright lights from the plant, reflecting in the sky, made it difficult to see a train on the crossing at night; and the lights from the plant did not silhouette trains on the crossing. The crossing was obscured and somewhat confused by these lights from this plant.

After the accident in question occurred, State Public Service Commissioner Norman Johnson, Jr., telegraphed W. A. Johnston, President of the Illinois Central Railroad Company, and on that same day the latter wired the Commissioner, stating that the city had failed to erect certain warning signs which the railroad sent the city in May 1959. This telegram further stated: "Moreover, people are ignoring Mississippi Law Stop. Suggest that Mississippi Power & Light Company be requested to shade lights as their lights cause confusion." This telegram from the president of appellant railroad was admissible in evidence as an admission against interest. It reflects that appellant's president

recognized that the plant's lights caused confusion at the crossing.

In the area east of the railroad and north of the street, there were situated an office building and a shop or garage building for Hinds County District No. 1. The vision of an approaching motorist going west on Northside Drive is obstructed to some extent by these buildings. At a distance of 350 feet east of the crossing, motorists going west could not see a train more than 349 feet up the track, which distance would be covered by a train traveling 20 miles per hour in twelve seconds, while an approaching automobile traveling at thirty miles an hour would reach it in eight seconds. In the instant case, Williams' car collided with the middle of the freight train. However, the fact of obstruction of vision by these buildings was relevant on the issue of whether the crossing was more than ordinarily dangerous, requiring special precautions. The general nature of the crossing is pertinent on that question. 74 C. J. S., Railroads, Sec. 725, p. 1338.

There are several photographs in the record, including three taken by a police officer on the night of the accident. They and daytime photographs tend to support the view that this crossing was an unusually dangerous one. Maps and plats in the record described the physical details, locations and elevations of the grade, the generating plant's structures, and other pertinent factors. Approaching the crossing from the east, there were signs stating "Speed Limit 30", "No Passing", and the usual, unlighted "Mississippi Law Stop".

The Railroad had ample notice of the unusually dangerous nature of this crossing. Public Service Commissioner Johnson testified that, considerably before the date of Williams' death, he gave the railroad such notice, through its officers, on several occasions. Appellants introduced in evidence an aerial photograph of the crossing, which it had made January 23, 1959. Within less

than nine months before Williams' death there had been two serious accidents at this crossing, in one of which four people were killed, and in the other four young people were injured, while driving west on Northside Drive at night. The admissibility of this evidence will be discussed subsequently. The telegram from appellant's President Johnston to Commissioner Johnson, dated August 27, 1959, recognized some of these facts, and stated that the generating plant's lights caused confusion.

The evidence supported the chancellor's finding that Williams was contributorily negligent. There were no eye-witnesses. Police officers arriving on the scene shortly after the occurrence found skidmarks of 111 feet leading up the hill to the crossing, where the car apparently collided with the train. Complainants' witness Captain Williams said that skidding 111 feet on level ground would indicate a speed of 50 miles per hour. With an average reaction time of three-fourths of a second, at that speed the car would have moved 55 feet before braking. It was his opinion that Williams saw the train when he was 165 feet from it. It was not clearly established that the skidmarks were those of Williams' car, nor was the chancellor required to accept Williams' testimony as to average reaction time, awareness of the train, and related factors. At any rate, he concluded that, although Williams was not familiar with the crossing, he was traveling more than 30 miles per hour, first saw the train when 165 feet away, and did everything he could thereafter to avoid hitting the boxcar, but that, because of his speed, Williams was guilty of contributory negligence.

However, the chancellor held that the crossing was more than ordinarily dangerous, which required appellant to take more than ordinary precautions not to injure others; that the company had actual notice of this fact and was under a duty to use adequate warnings and

signals, but failed to do this, and as a proximate cause Williams was killed. After diminishing damages in proportion to the amount of negligence attributable to Williams, the court awarded complainants damages of $60,000.

■■ Appellant contends decedent's negligence was the sole, proximate cause of his death. We do not agree. The great weight of the evidence reflects that this crossing was unusually dangerous, that the railroad had ample notice of this fact, but wilfully failed to take any adequate precautions to notify the traveling public. ■■ The negligence of the railroad and Williams were concurring causes, each being a proximate cause of the accident. Under Code Sec. 1454, the comparative negligence act, Williams' contributory negligence does not bar recovery, but serves only to diminish the damages of his next of kin. Mississippi Central Railroad Company v. Alexander, 169 Miss. 620, 152 So. 653 (1934); Columbus and Greenville Railroad Company v. Lee, 149 Miss. 543, 115 So. 782 (1927); New Orleans and N. E. R. R. v. Hegwood, 155 Miss. 104, 124 So. 66 (1929); Donald v. Gulf M. & O. R. R. Company, 220 Miss. 714, 71 So. 2d 776 (1954); Boyd v. I. C. R. R. Company, 211 Miss. 409, 52 So. 2d 21 (1951); Prosser, Torts (1955), pp. 296-299.

Russell v. Mississippi Central Railroad Company, 239 Miss. 741, 125 So. 2d 283 (1960), is distinguishable and not controlling here. There the physical facts, as reflected by photographs and engineers' plats, showed there was no steep hill leading down to the railroad tracks, and no abrupt dip sufficient to have an appreciable effect on the headlights of an automobile approaching the crossing. On the contrary in the instant case, the physical facts, photographs and engineers' plats reflect that this crossing was unusually dangerous. See 2 Harper and James, The Law of Torts (1956), p. 972-974, 1114-1115.

## III.

The bill of complaint alleged, as an independent ground of liability, that defendant had failed to light the crossing as required by Sec. 1399 of the Jackson City Code; and that failure to comply with this ordinance was negligence, which proximately contributed to Williams' death. Defendant admitted it had not placed lights at the crossing. City Code Sec. 1399 provides: "The several railroads entering the City are hereby required to erect, at the intersection of their roads with the several streets of the City, electric lights, to be lighted on the same schedule as other street lights of the City are lighted."

Appellant contends this ordinance was beyond the power of the City to enact, and was therefore invalid. However, it was based properly on the authority conferred upon municipalities by Sec. 2447, Miss. Code 1930, being Code 1942, Sec. 3454 (re-enacted in Miss. Laws 1950, Ch. 491, Sec. 152). That statute grants a city in broad terms powers to regulate crossing of railways, to provide precautions, and to prescribe rules governing them. See Nashville, C. & St. L. Ry. v. White, 278 U. S. 456, 49 S. Ct. 189, 73 L. Ed. 452 (1929).

Appellant asserts that the effect of this ordinance, because of the high cost to a railroad of complying with it, is to render it confiscatory and wholly unreasonable, and therefore violative of the due process clauses of the State and Federal Constitutions. The issue was raised by a motion to strike portions of the original bill, upon which there was a separate hearing.

Defendant's main line runs through Jackson above street level. There are only two crossings on it at grade level, and both are safeguarded with bells and flashing light signals. The Y. & M. V. line of defendant (the freight line), on which this accident happened, has only three public street crossings. Defendant has not lighted

any of them. They have only the regular "Mississippi Law Stop" signs on them.

Appellant's evidence showed that the cost of installing one light at a crossing would be $520, for a second light $420, or a total of $940 for two lights. There are 84 grade-level spur tracks, sidetracks and switch tracks of defendant in the city. Forty three are flagged by train crews. Two lights at each of these grade-level spur tracks, etc., would require $79,000. Operating costs for maintaining lights at all 84 crossings would be $22,340 per year. Therefore, appellant argues, the cost of complying with the lighting ordinance at all of its 84 grade crossing in the city would be so high as to be confiscatory. We do not agree. First, the ordinance applies by its terms only to appellant's main lines, not to every little-used spur, side or switch track. It states that railroads "entering the city" must erect lights "at the intersection of their roads with the several streets of the city." As so interpreted, with few of such crossings and most of them already equipped with flashing lights and bells, the cost of complying with Sec. 1399 would be relatively small.

Second, appellant offered no evidence which would show that its cost of complying with this ordinance would be unreasonable, exorbitant, or would endanger its financial integrity. What evidence there is shows the contrary. See Ft. Smith Light & Traction Company v. Board of Improvement, 274 U. S. 387, 47 S. Ct. 595, 71 L. Ed. 1112 (1927). A statute or ordinance will not be held unconstitutional unless the evidence is clear and convincing that it violates a constitutional limitation. The burden is upon the one assailing the enactment to establish that fact, and appellant failed to do so.

 ██ The chancery court found that the crossing was dark; that the city street light 104 feet west of it did not illuminate it; that the railroad failed to take more than ordinary precautions at this unusually dang-

erous crossing, and this failure was negligence and a proximate cause of Williams' death. Where safeguards are prescribed by an ordinance at a public crossing, it is negligence per se not to use such precautions. 74 C. J. S., Railroads, Sec. 730; Teche Lines v. Bateman, 162 Miss. 404, 139 So. 159 (1932); Gulf and Ship Island Railroad v. Simmons, 153 Miss. 327, 121 So. 144 (1929); Jerrell v. New Orleans & Northeastern Railroad Co., 109 Miss. 49, 67 So. 659 (1915).

■■ ■■ Section 1402 of the Jackson Municipal Code requires certain designated railroads, including appellant, to remove the stop signs from all crossings in Jackson and to maintain a 24-hour flag service over them. Municipal Code Sec. 1403 requires that all flagmen flag crossings "in such manner that it will not be necessary for vehicles to stop except on the stop signal displayed by the flagman when trains are approaching the crossings." The bill of complaint charged that appellant's failure to comply with these ordinances, or to take any other proper precautions at this dangerous crossing, was negligence which was a proximate cause of Williams' death. However, at the beginning of the trial appellees' counsel made a statement to the court in which he said that the suit was based on two counts, first, failure to light the crossing, and second, to either light it or use any other sufficient ordinary method of giving warnings. He further said that complainants did not contend the lack of a flagman at Northside Drive "was within itself an act of negligence", but that the failure of the railroad to use this or any other method to make the crossing more safe "is simply one of the factors to be considered as a part of the overall total failure" of defendant to take any precautions. The trial court made no mention of the flagman ordinances, either in its opinion or decree. Liability was based on the two theories presented by complainants.

Under these circumstances, the statement by appellees' counsel was the equivalent of waiving any claim by them that violation of the flagman ordinances was of itself a ground of negligence. Hence there was no reversible error in the trial court's overruling defendant's motion to strike those parts of the bill pertaining to these ordinances. Complainants subsequently waived those assertions. The chancellor, who tried the case on the facts and law, recognized in effect that waiver. His final decree was not based in any respect upon the flagman ordinances. Accordingly we do not reach or consider in this case their validity.

## IV.

The trial court admitted into evidence, over objections of defendants, answers to complainants' interrogatories concerning two other accidents which happened at the Northside Drive crossing with the Y. & M. V. line, within less than nine months before Williams was killed. On January 1, 1959, a locomotive struck a car, and four people were killed. In the second accident on March 19, 1959, the automobile struck the side of a locomotive, and four young people were injured. Appellant contends that the facts and circumstances of these accidents were entirely different from those in the instant case, so the evidence should have been excluded; and that prior occurrences must involve substantially similar facts having a bearing on the litigated case.

This evidence was admitted for the purpose of showing notice to the railroad of the unusual danger and the existence of a dangerous condition. S. H. Kress & Co. v. Markline, 117 Miss. 37, 77 So. 858 (1917); Anno., 128 A. L. R. 595 (1940). 20 Am. Jur., Evidence, Sec. 304, summarizes the general rule as follows: ". . . evidence of other similar accidents or injuries at or near the same place or by the use of the same appliance suffered by persons other than the plaintiff and in other

and different times, not too remote in point of time from the particular occurrence, is admissible. Evidence of prior similar accidents, when admissible, is generally admissible for the following purposes only: (1) To show the existence of a defective or dangerous condition or appliance and the dangerous character of the place of injury or of the machine or the appliance, and (2) to show the defendant's notice or knowledge thereof.''

■■ The trial court permitted City Police Captain Williams, County Patrolman Mattox, and Civil Engineer Patton to answer in the affirmative, over defendant's objections, questions as to whether, in their opinions and from an examination of the premises, the crossing was unusually dangerous. The chancellor (as the trier of facts) stated he would admit this evidence for whatever it might be worth. Williams was also permitted to testify that in his opinion the passage of almost 3,200 motor vehicles a day over the crossing is a factor to be considered on unusual danger; and to further state that in his judgment the physical terrain and the headlights would not readily disclose the presence of the train. The court again said it would hear this evidence for what it was worth since it was ''just one element, part of the testimony.''

It was error to admit this opinion evidence, but it was not reversible error. The chancellor admitted it for whatever it might be worth, and apparently attached no particular importance to it. We do not think its admission affected the result in the case. Rule 11 of this Court provides that a judgment shall not be reversed for the improper admission of evidence, ''unless it shall affirmatively appear, from the whole record, that such has resulted in a miscarriage of justice.''

■■ Where the facts can be produced and presented to the jury or other trier of facts by direct evidence, in such a manner that they can have an adequate basis for formulation of their own decision, without extran-

eous assistance, opinion evidence (such as that here) should not be admitted. Ordinarily a witness must confine his testimony to matters within his own knowledge. 20 Am. Jur., Evidence, Sec. 765. The true criterion is whether a jury from this person can receive appreciable help. If the facts cannot be presented or communicated, opinion evidence may be received. The facts concerning this crossing were adequately presented by direct testimony, photographs, engineers' surveys, etc. The basis of admission of expert opinion testimony is that of necessity. 7 Wigmore, Evidence (3d ed. 1940), Secs. 1918, 1923. No such necessity existed here. 20 Am. Jur., Evidence, Sec. 819; Anno. 146 A. L. R. 5, 11, 45-46 (1943). In short, since an expert witness in a sense discharges the functions of a juror, his opinion should not be admitted unless it is clear that the jurors themselves are not capable, from want of experience or knowledge of the subject, of drawing correct conclusions from the facts. 32 C. J. S., Evidence, Sec. 520. Accordingly, this evidence was improperly admitted, but those rulings of the trial court were not reversible error, for the reasons previously stated.

Affirmed.

*Lee, P. J.,* and *Kyle, Arrington* and *Gillespie, JJ.,* concur.