19421

Emmett C. STILL, Appellant, v. HAMPTON AND BRANCHVILLE RAILROAD and the South Carolina State Highway Department, Respondents

(189 S. E. (2d) 15)

418

*Messrs. I. A. Smoak, Jr.,* of Walterboro, and *Henry Hammer,* of Columbia, *for Appellant,*

Messrs. *Daniel R. McLeod,* Atty. Gen., *C. Tolbert Goolsby,* and *Edwin B. Brading,* Asst. Attys. Gen., of Columbia, and *Isadore Bogoslow,* of Walterboro, *for Respondent, South Carolina State Highway Department,*

Messrs. *Randolph Murdaugh,* of Hampton, and *James P. Harrelson, Gerald C. Smoak,* of Walterboro, *for Respondent Hampton* and *Branchville Railroad,*

May 22, 1972.

BRAILSFORD, Justice.

Plaintiff sustained personal injuries and property damage on August 26, 1964, in a collision of his automobile with the thirty-second car of a forty-car train crossing South Carolina Highway No. 64 in Colleton County. Two days later, he commenced this action against the railroad company and the South Carolina Highway Department, alleging that the crossing was unusually dangerous, and that his injuries were proximately caused, without negligence on his part, by the negligent and reckless failure of the defend-

ants to adequately mark and protect it. Upon trial of the case in December, 1970, the trial judge concluded that the evidence was insufficient to establish that either defendant was guilty of causal negligence, and that the only reasonable inference therefrom was that plaintiff's injuries were caused by his own negligence in the operation of his automobile. Accordingly, he granted defendants' motion for a directed verdict, from which plaintiff has appealed. A somewhat detailed statement of the facts is required.

On the morning of August 26, 1964, plaintiff accompanied by his wife, his niece, Mrs. Robert Guest, and Mrs. Guest's young daughter drove from Belton to Walterboro where they attended an evening wedding and reception. At about 9:00 P. M. plaintiff and his party left Walterboro driving north on South Carolina Highway No. 64 toward Barnwell, which was the same route they had traveled earlier in the day.

The track of the defendant railroad company crosses the highway, at about a 45° angle, between Bell Crossroads on the south, where plaintiff made a short stop, and nearby Lodge on the north. The terrain in this vicinity is moderately rolling The asphalt highway is of standard width with grass shoulders on each side. The highway is straight on both approaches to the crossing, which can be seen in the daytime from a crest one-half mile to the south. There is a lower crest at about fifteen hundred feet from the track; thence, the highway is moderately downgrade some fourteen hundred feet to a culvert, variously estimated at sixty to one hundred feet south of the crossing. A slight upgrade commences at or near the culvert. According to the only testimony on the point, the elevation at the track is not more than six inches higher than that at the culvert. Again, according to the only testimony on the point, the incline of the highway for several hundred feet north of the crossing is at the rate of about one foot per hundred feet, or a modest one percent grade. The upgrade continues for an unspecified distance through a curve to another crest. The area

to the right of this curve is wooded, and the trees form a background against which a train occupying the crossing is seen by a traveler approaching within five hundred feet from the south. There was much testimony about other trees and vegetation in the vicinity of the crossing, but none encroached on the shoulders or highway; hence, none bore significantly upon the opportunity of a motorist to see a train occupying the crossing.

The night was moonless and the weather fair. Plaintiff was driving between fifty and fifty-five miles per hour. He testified that his lights were on high beam and that he had good visibility for four hundred feet ahead as he proceeded along the highway. He was unaware of the crossing, and saw no signs indicating its presence. He testified that the first warning he had of danger was when he saw the dark cars across the highway eighty or ninety feet in front of him. He jerked his car to the right and applied his brakes, leaving skid marks which commenced thirty-two feet from the track. At that moment he saw a railroad sign for the first time. When asked why he could not see the train at a greater distance, he testified that "(i)t just wasn't visible to me." He also testified "at the incline is the time as the car raised up—that was when I saw the train."

The testimony of Mrs. Guest and of Mrs. Still was of the same tenor. Both testified that they were watching the highway but neither saw any sign indicating the presence of a railway crossing. The appearance of the dark cars across the highway in close proximity to the automobile—eighty to ninety feet according to Mrs. Still, the length of the courtroom according to Mrs. Guest—was the first notice to them of the presence of the track. Mrs. Still testified that it was dark and she could barely see the cars; that the train was not visible to her from a greater distance than eighty to ninety feet.

All of the occupants of the car were injured in the collision and were taken by ambulance to a hospital in Walter-

boro. Robert Guest was advised of the whereabouts and condition of his wife and daughter. Destined to become plaintiff's star witness, he stopped at the crossing on his way to Walterboro that night, as he put it, "to see what I could see—how it happened any evidence around." He noticed, according to his testimony, that the standard highway advance warning sign was too close to the track, and ascertained by counting steps that it was only fifty feet. (The South Carolina Highway Department Manual requires three hundred to five hundred feet.) He testified positively that the sign was north of the culvert, which it had to be if within fifty feet of the crossing; further that the sign was faded, rusty and had lost most of its light reflective quality. The witness also observed and described the railroad crossbuck signs, as to which there is no material conflict in the testimony.

This witness testified that he revisited the scene on the morning of August 28, and was astonished to see that the highway advance warning sign had been replaced by a freshly painted one at an appropriate distance from the crossing. He elaborated that he found fresh paint drippings on the ground under the new sign, and he found the hole, freshly filled with loose sand, near the track from which the old one had been removed.

By coincidence, the wedding photographer learned of the accident shortly after it occurred and went to the scene. He found plaintiff's demolished automobile there and took a picture of it. He also took a picture of the crossing from a point about three hundred feet south of it. The markers on the shoulder of the road at the culvert and the crossbuck signs at the crossing are conspicuous in this photograph. The absence of a highway warning sign within the range of the camera is equally conspicuous. That the picture was taken before the witness Guest made the observations about which he testified is made clear by his testimony that the wrecked automobile had been removed before he arrived.

There is no suggestion that the photograph, which jibes with all of the other testimony as to the location of the warning sign on the night of the accident, is counterfeit. Indeed, plaintiff makes no serious attempt to explain the damning disparity between Guest's testimony as to the location of the sign and the photograph; instead, he attempts to sweep it under the rug. with the assertion that the photograph "lends support to the plaintiff's testimony that the advance warning sign was invisible."

During the ensuing week, while his wife and daughter remained in the Walterboro hospital, this witness revisited the scene several times at night. He testified that he made tests to determine the point at which a northbound motorist could first see a train occupying the crossing. He stated that he had no opportunity on these occasions to observe a train but, based upon his view of the crossbuck sign, he concluded that a train on the crossing would not be revealed by automobile lights until the vehicle was within ninety to one hundred feet of the track. He essayed the following explanation of this phenomenon.

"Q. Now what view does a motorist have of this crossing from the crest of the hill?

"A. From the crest of the hill the road is downgrade. The lights shine at the same angle, but the lights intersect the beginning of the hill. . . . Now this is true all the way down the hill. The hill being on a slope like this, the bottom of the hill being where my finger is and the railroad track being somewhere advanced of this on the side of the next hill. The lights intersect the ground on the railroad side of the culvert all the way down the hill. Now as the automobile gets to the culvert and as the automobile starts up the hill the lights also go up with the automobile and at that point I could see enough of the cross buck sign to say I could also have seen the train if it had been there.

"Q. And at what point was that on the highway? How far from the railroad crossing?

"A. That was one hundred—that was approximately ninety to a hundred feet from the track."

This astonishing explanation is refuted by facts ■■ which are of common knowledge and of which we take judicial notice. 29 Am. Jur. (2d), Evidence, Sec. 22 (1967) ; 9 Wigmore, Evidence, Sec. 2580 (3d ed. 1940). Automobile headlights do not project their beams in a plane parallel to the roadway. Instead, they provide illumination in depth, shining upon both the surface of roadway and upon objects at considerable heights above it, particularly when the lights are, as plaintiff's were, on high beam. In short, it is of common knowledge that gentle to moderate grades, such as those at this crossing, have no significant effect on the visibility provided by automobile headlights on high beam. The witness' contrary testimony was without probative value and was properly rejected by the trial judge.

The witness also testified in elaborate detail as to trees and other vegetation at and near the crossing, which would have been significant if plaintiff and the locomotive had approached the point of collision at approximately the same time. But this was not the case. It is apparent that the slowly moving train already occupied the crossing when plaintiff reached the crest one-half mile south of it. The trees and vegetation could have had no effect on plaintiff's opportunity to see the cars crossing the highway except, perhaps, by preventing a silhouette of the cars against the skyline, if this would otherwise have been possible on this moonless night.

The crossing was marked by conventional crossbuck ■ signs on both approaches, as required by Sections 46-310 and 58-999, Code of 1962. However, it was contended at the trial that these signs failed to comply with the highway department's manual, as required by statute, in that the crossarms were black with white reflectorized lettering, instead of the reverse of this. No issue thereabout is presented for review, because plaintiff did not except to

the direction of a verdict in favor of the railroad company upon the ground that the company's failure to comply with its statutory duty in this respect required submission of the case to the jury.

Plaintiff's whole case against the railroad company, as argued in his amended brief, [1] is that, because of extraordinary hazards existing at this crossing, it owed a common law duty to give reasonable warning by lights, flagman or otherwise that the highway was blocked by its slowly moving train. Plaintiff thus recognizes the soundness of the occupied crossing doctrine, *i. e.,* that in the absence of special hazard, a railroad company has the right to occupy a crossing for its legitimate purposes, furnishing only such warning to travelers as may be required by statute. With respect to this doctrine and the exception to it in case of unusual hazard, in the recent case of *Poole v. Southern Railway Company,* 250 S. C. 213, 157 S. E. (2d) 175 (1967), we quoted from *Illinois Central Railroad Company v. Williams,* 242 Miss. 586, 135 So. (2d) 831, the following statement of the rule:

" 'A railroad has the right to occupy a crossing for its legitimate purposes, and, while so occupying it, the carrier is not required to maintain lights on its cars or to station a man with a lantern at the crossing to give warning that it is obstructed by cars, unless the conditions and circumstances are such that the employees of the railroad know, or in the exercise of reasonable care and caution should have known, that a person driving upon the highway at a reasonable rate of speed in an automobile properly equipped with lights, and carefully operated, could not see, or might not be able to see, the cars in time to avoid a collision with them. . . .' " 250 S. C. at 219-220, 157 S. E. (2d) at 179.

Continuing from *Poole,*

"The rule as announced by the Mississippi court would appear to be in accord with the entire weight of authority

---

[1] The amended brief was filed when plaintiff's original brief was challenged for failure to comply with Supreme Court Rule 8, Section 8.

in this country, as well as the rationale of our own decisions dealing with unusually dangerous crossing situations. See 44 Am. Jur. 742, Railroads Sec. 502; annotation in 24 A. L. R. (2d) 1201; and *Carlson v. So. Pac. Co.,* 219 Or. 77, 346 P. (2d) 381." 250 S. C. at 220, 157 S. E. (2d) at 179.

In the case at hand, the crossing is in a rural area. The railroad track is the company's seventeen-mile-long mainline from Hampton to its junction with the Seaboard Coast Line in Colleton County. The road is a state highway with one terminus at Jacksonboro and the other at the Savannah River Plant near Barnwell. The highway is straight for some one thousand five hundred feet from the last crest south of the crossing; the grades are insignificant; the weather was fair; the coal cars, of which the train was composed, were dark in color, but most of them bore white letters and numbers; plaintiff's lights were on high beam and, according to his estimate, furnished good visibility for four hundred feet ahead; there were no obstructions to his view of the train as it moved across the highway directly in front of him; there was no other traffic and no distracting influences.

The evidence fails to show the existence of any unusual condition or hazard at the crossing which could have prevented plaintiff from seeing the train in time to stop in safety if he had been exercising due care in the operation of his automobile. *A fortiori,* there is no evidence to charge the employees of the railroad company with notice of the existence of such a condition. Under the rule applicable to these circumstances, the company's failure to give warning of the train's occupancy of the crossing was not evidence of negligence in the operation of its railroad.

In reaching this conclusion we have, of course, disregarded as without probative value the testimony of Robert Guest that a train on this crossing is not illuminated by the headlights of an automobile approaching from the south until the vehicle is within ninety to one hun-

dred feet of the track. But even if the testimony of this witness involved a question of credibility for the jury, there was no error in directing a verdict for the defendant company. Under the rule adduced, the burden on a railway company to take extraordinary precautions in an occupied crossing situation does not arise until it knows or by the exercise of due care should have known of the unusual hazard existing at the crossing. Here, there is a complete absence of evidence that the company knew, or should have known, that on the approach to this crossing from the south, automobile headlights would be incapable of performing the function for which they are designed.

Plaintiff's whole case against the highway department is based upon the testimony of Robert Guest that its advance warning sign was in a deteriorated condition and was located much closer to the crossing than required by its manual. Although this testimony was against the overwhelming weight of the evidence, including the unimpeached photograph taken before the inspection of the scene by the witness, its credibility was for the jury in the first instance. Nevertheless, there was no error in directing a verdict for the department. The enabling statute which permits suit against the highway department requires a plaintiff to allege and prove that he did not negligently contribute to his own injury. Section 33-232, Code of 1962. We conclude that plaintiff failed to meet this burden. Instead, the only reasonable inference from the evidence is that plaintiff was guilty of negligence which was at least a contributing cause of his injuries. Our reasons for this conclusion have been sufficiently stated.

A number of excellent photographs of the scene, which were taken in the daytime about two weeks after the accident, and the photograph taken on the night of the collision were admitted in evidence over plaintiff's objection. One photograph was taken from a point 957 feet south of the crossing, one at 200 feet south of it, and three others were taken at intermediate distances. As a group these photo-

graphs corroborate the oral testimony that the downhill-up-hill grades on the approach to the crossing were only slight, that the roadway was straight and that the vegetation and trees in the area did not obstruct a traveler's view of the crossing. The photographs were properly qualified, and the exception charging error in their admission is without merit.

Affirmed.

Moss, C. J., and LITTLEJOHN, J., concur.

LEWIS and BUSSEY, JJ., concur in result.

