Mary E. HALES, a Minor, by and through her father and next friend, Bobby J. WILLIAMS, Plaintiff-Appellant,

v.

ILLINOIS CENTRAL GULF RAILROAD COMPANY, Defendant-Appellee.

No. 82–4206.

United States Court of Appeals, Fifth Circuit.

Oct. 28, 1983.

Samuel H. Wilkins, Mary Lou Payne, Jackson, Miss., for plaintiff-appellant.

Clifford K. Bailey, III, Erskine W. Wells, Jackson, Miss., for defendant-appellee.

Before GARZA, RANDALL and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is an appeal from a Mississippi diversity judgment rendered for appellee Illinois Central Gulf Railroad ("Illinois Central"), after a nonjury trial, dismissing a suit against it by appellant Mary E. Hales ("Hales") for personal injuries and property damage sustained as a result of a collision

between Hales' car and one of Illinois Central's freight trains at a crossing just inside the corporate limits of Flowood, Rankin County, Mississippi. The principal question on appeal is whether, by reason of the limited view Hales had of the approaching train as she drove toward the crossing, primarily because of a line of trees along the Railroad's right-of-way near the crossing, the crossing was unusually dangerous, thus requiring Illinois Central to have added a signal light or other special warnings to motorists. Because the district court failed to make findings of fact respecting the dangerousness, if any, of the crossing as a result of the limited view afforded approaching drivers such as Hales, the adequacy of the warnings given, and the effect thereof as concerns causation of the collision, we reverse and remand the case to the district court for further factual findings.

## I.

Hales was employed at the Jackson Municipal Airport in Jackson, Mississippi, as a security officer. On the morning of December 23, 1978, she was running late for work and decided to take what she had been told was a shortcut from her residence to the airport. This shortcut was known as Flowood Drive, a public paved road over which Hales testified that she had never before traveled.[1] Hales, who was alone, was driving her 1976 Toyota Celica. As she traveled westbound in the right-hand lane of Flowood Drive, she came to the railroad crossing in question where, at 7:45 a.m., she collided with one of Illinois Central's freight trains, which was traveling in a northeasterly direction.

The record shows it was daylight, that visibility was good, but that the morning was cold and overcast. The angle at which Flowood Drive intersected with the railroad track was about 120 degrees. The grade east of the crossing was "fairly level," with a slight incline at the crossing. The crossing itself was marked by two "crossbuck" signs, which stood about ten to fifteen feet away from the tracks, one on the east side facing east, the other on the west side facing west. Each sign had written on it "Railroad Crossing" "1 Tracks." It is undisputed that these signs were the only warnings of any kind that were given to motorists of this crossing. There were no other signs, no signal lights, or other electronic warning devices to alert a motorist of an approaching train. Although the crossing was within the corporate limits of Flowood, the evidence showed that the immediate area was rural and undeveloped, and that traffic on this part of Flowood Drive was not heavy, but normal.

The evidence further showed that at 352 feet Hales had a clear, unobstructed view of the crossbuck sign that faced east. However, it was undisputed that there was a thick line of trees which began at a point near the south side of Flowood Drive on the east side of the tracks and extended approximately 1,000 feet in a southwesterly direction along the fence line of the Railroad's right-of-way. It was further undisputed that this tree line was generally parallel to and, at the crossing, approximately eighty feet east of, the railroad tracks,[2] and that a westbound motorist on Flowood Drive had a clear, unobstructed view (350 to 400 feet) down the tracks southwesterly of the crossing *only* when the motorist had passed this tree line. It was also established that between the tree line and the tracks there was a line of brush and weeds ranging in height from two to eight feet. There was also a line of trees along and roughly parallel to the north side of Flowood Drive, which ended something over 100 feet east of the crossing.

According to Hales' testimony, she was traveling between twenty and twenty-five miles per hour as she approached the crossing. She had her car windows rolled up and

---

1. Mrs. Bobbie Jones Daughdrill, who lived on Flowood Drive just east of the crossing, testified that Hales told her that "she [Hales] had been through there a few times and someone had told her it was a shortcut ...."

2. As the tree line extended southwesterly of the crossing it tended to be closer to the tracks.

her car radio turned on. She stated that she did not see the eastside crossbuck sign until she was right upon it. She also testified that she did not see or hear the approaching train until just before the collision. Although she could not recall how far from the crossing her car was when she first looked to her left, or when she first applied her brakes, there was testimony by two nearby, longtime residents that, after the accident, they measured approximately eighty feet of skid marks leading up to the tracks.[3]

At trial, Hales produced an expert witness, Robert Dixon, a professional civil engineer engaged primarily in the design and construction of roads for the City of Yazoo and Yazoo County, who testified that an unobstructed view down the railroad tracks from a distance of just eighty feet from the crossing would not give a motorist traveling twenty to twenty-five miles per hour, in a car similar to that which Hales was driving, time to come to a safe stop, if a train were approaching the crossing.[4]

Dixon further testified that, as far as "sight visibility" was concerned, in order to make a safe and lawful stop,[5] a motorist, traveling at thirty miles per hour, would require an unobstructed view down the railroad tracks of 225 feet (from the crossing) at a distance on the road of 200 to 215 feet from the crossing. Dixon also stated that "sight visibility" is a primary consideration at crossings without signals or gates, and that if obstacles obscure a motorist's view, then the obstacles should be removed, or if this is impractical, then the crossing should be equipped with flashing or signalized lights, signs, or a gate.

Thomas R. Mitchell, the train engineer, had been employed by Illinois Central since 1966, and had spent a majority of his time on the tracks which crossed Flowood Drive.

Mitchell testified that on the occasion in question he had begun to blow the whistle and ring the bell on the lead engine about 1,100 feet southwest of the crossing.[6] Four headlights on the lead engine were turned on "bright." Mitchell further testified that the lead engine, which was orange and white, stood fifteen feet high, and that from his seat inside the engine (on the right-hand side) he was ten to twelve feet above the ground. Mitchell stated that he first saw Hales' car, which he estimated stood five feet high, through small openings in the brush and trees at about 120 feet east of the crossing, and, at that point, the lead engine was approximately 400 feet south of the crossing and was traveling twenty-five miles per hour. Mitchell continued to ring the bell and blow the whistle as the train approached the crossing. Because Mitchell thought Hales was going to stop, he did not apply the train's brakes or slow the train down at that point. He then saw Hales' car "slide up" and stop at the crossing, with about one foot of the front end of her car over the east track. When he realized that Hales was in danger of being hit, he applied the train's emergency brakes at about fifty to sixty feet southwest of the crossing. The right front side of the lead engine collided with the left front fender of the car, causing the car to spin around, strike the eastside crossbuck sign, and flip over onto its back. The lead engine traveled some 550 feet beyond the crossing before stopping.

Hales fortunately escaped serious injury. She filed suit against Illinois Central in the Circuit Court of Yazoo County, seeking damages for her personal injuries and for the property damage to her car, contending primarily that the crossing was unusually dangerous, thus requiring special warnings

---

3. The train engineer, Thomas R. Mitchell, testified that he saw about forty feet of "heavy skid marks" after the collision.

4. The record shows that the speed limit on that part of Flowood Drive where the collision occurred was thirty miles per hour.

5. Whenever a driver of a vehicle is required to stop at a railroad crossing under section 77–9–

249, Miss.Code Ann., the driver must stop his vehicle within fifty feet, but not less than fifteen feet, from the nearest rail of the tracks.

6. The record shows that the train consisted of forty-three cars (twenty of which contained loads) and three engines.

to motorists apart from the crossbuck signs. Illinois Central removed the case to the federal district court for the Southern District of Mississippi, where the case was tried to the court. In its written opinion, the district court found that Illinois Central was not guilty of any negligence in "its operation of this train at the time in the Flowood vicinity"; that, though she was not "proceeding at an unlawful rate of speed," Hales nevertheless had failed "to exercise reasonable care for her own safety at the time"; that there was "nothing to obstruct [Hales' vision] to keep her from seeing the . . . train if she tried to do so"; and that Hales had "simply invited this accident by her own conduct." The court thus rendered a take-nothing judgment against Hales.[7]

## II.

Although, after reviewing the record, we determine that the findings that Illinois Central was not guilty of negligence in the operation of its train, and that Hales' negligent failure to keep a proper lookout on the occasion in question was a proximate cause of the collision, are not clearly erroneous, it is unclear whether her negligence was the sole proximate cause of the collision.

As stated above, the testimony indicated that Hales could not have clearly seen the approaching train until she was not much more than approximately eighty feet from the crossing.[8] There is also Dixon's uncontradicted testimony that the minimum distance for a car traveling thirty miles per hour to make a safe stop (after seeing an approaching train) would be approximately 200 feet. However, the district court failed

to make findings as to whether or not these circumstances rendered the crossing unusually dangerous, and if so, then whether it was a proximate cause of the collision.

In its opinion, the district court stated that:

> "The plaintiff contended that it was her view that the railroad owed the public the duty to install some kind of warning device in the area to alert the traveler that a train was in the vicinity."

However, the court never expressly answered her contention that the crossing required such warnings because it was unusually dangerous. The court did state that:

> "There was nothing about the trees on the [east] side of the [right-of-way] to keep her from seeing the train for a great distance. The shrubbery at that time of year [had] lost its leaves and did not interfere in any manner with plaintiff's seeing, or hearing the train if she had exercised the slightest degree of care to do so."

Although the court's finding that the weeds and shrubbery between the tree line and the tracks did not interfere with Hales' view is supported by the evidence as to the length of her skid marks, as well as by the fact that in December such seasonal growth was less dense, the finding that the trees did not obstruct her view is correct only if the court was speaking of the view that Hales had *within* approximately eighty feet of the tracks, since it was established that Hales' view was obstructed beyond not much more than some eighty feet by the tree line which ran along the Railroad's right-of-way.[9]

---

7. The record shows that Illinois Central quit using this route in 1979 or 1980, and that the tracks had been taken up by the time of trial.

8. The fact that there was testimony that Hales' car left eighty feet of skid marks indicates that she first saw the train (or the crossing) and applied her brakes more than eighty feet from the crossing. However, even if she had applied her brakes at 120 feet from the crossing, according to Dixon's testimony, she still had an insufficient distance in which to make a safe and lawful stop.

9. The district court's findings strongly suggest that the court was operating under the assumption that Mississippi law required every motorist to stop at a railroad crossing before proceeding over it. This was the law until 1974, when section 77–9–249 was enacted by the Mississippi Legislature. This statute provides, in part, as follows:

> "(1) Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances stated in this section, the driver of such vehicle shall stop within fifty feet but not less than fifteen feet

In *Illinois Central Railroad Company v. Williams,* 242 Miss. 586, 135 So.2d 831 (1961), an occupied crossing case,[10] the Supreme Court of Mississippi held that a crossing was unusually dangerous where the speed limit was thirty miles per hour and where the testimony showed that a motorist at night had to get "fairly close" to the crossing before a beam of his headlight would strike a boxcar. The Supreme Court of Mississippi rejected defendant's contention that plaintiff's established contributory negligence was the sole proximate cause of the collision:

> "The great weight of the evidence reflects that this crossing was unusually dangerous, that the railroad had ample notice of this fact, but wilfully failed to take any adequate precautions to notify the traveling public. The negligence of the railroad and Williams were concurring causes . . . ." 135 So.2d at 837.

*See also Newman v. Missouri Pacific Railroad Co.,* 545 F.2d 439 (5th Cir.1977) (where crossing was unusually dangerous, because of motorist's difficulty in apprehending the approach of a train, failure of the claimant to stop at crossing did not excuse negligence of railroad in failing to give adequate warnings of the crossing so as to render it less dangerous); *Badger v. Louisville & Nashville Railroad Co.,* 414 F.2d 880, 883 (5th Cir.1969) (that plaintiff was guilty of negligence, as a matter of law, did not defeat recovery where crossing was unusually dangerous because of obstructions).

As the *Williams, Newman,* and *Badger* cases illustrate, even though, as here, Hales' failure to keep a proper lookout was a cause of the accident, it may not have been the sole proximate cause if the crossing, which, as the record suggests, had been the scene of a recent train-car collision, was unusually dangerous. Indeed, given the obstruction of Hales' vision as she approached the crossing, the short distance in which to come to a safe stop after seeing an approaching train, and the absence of any warnings other than the two crossbuck signs located at the crossing, we refuse to say that, *as a matter of law,* Hales' negligence was the sole proximate cause of the collision. And, though there is weighty evidence of the dangerousness of the crossing, we also refrain from holding, as a matter of law, that the crossing was unusually dangerous. These are questions for the trier of fact. *Badger,* 414 F.2d at 883.

---

from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:

"(a) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train;

"(b) A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train;

"(c) A railroad train approaching within approximately nine hundred feet of the highway crossing emits a signal in accordance with section 77–9–225, and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;

"(d) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.

"(2) No person shall drive any vehicle through, around or under any crossing gate or barrier at a railroad crossing while such gate or barrier is closed or is being opened or closed.

"(3) In the trial of all actions to recover personal injury or property damages, sustained by any driver of such vehicles for collision of said vehicle and train in which action it may appear *that the said driver may have violated any of the provisions hereof, the question of whether or not the said violation was the sole or approximate cause of the accident and injury shall be for the jury to determine. The violation of this section shall not of itself defeat recovery, and the question of negligence or the violation aforesaid shall be left to the jury; and the comparative negligence statutes and prima facie statute of this state shall apply in these cases as in other cases of negligence."* (Emphasis added.)

As subsections (c) and (d) indicate, the need of a motorist to have an unobstructed view down the tracks in either direction far enough away from the crossing in order to execute *a safe and lawful stop* is very important.

10. In *Newman v. Missouri Pac. R.R. Co.,* 545 F.2d 439, 442 (5th Cir.1977), this Court made the following comment regarding occupied crossing cases: "Although, as the district court noted, this was not an 'occupied crossing' case . . ., the court was justified in drawing upon 'occupied crossing' cases for guidance."

Because the district court did not determine whether the crossing was unusually dangerous, it did not adequately address whether, *in light of that condition,* additional warning devices were required, and if so, whether the failure to provide those so required was a proximate cause of the collision.[11] If such were a proximate cause, then, as a matter of law, Hales' negligence could not be the *sole* proximate cause of the collision.

In view of the district court's failure to make adequate findings regarding the dangerousness of the crossing, the adequacy of the warnings respecting it, and its effect on causation, we feel that the case must be reversed and remanded so that the district court may make factual findings regarding these questions.[12]

REVERSED AND REMANDED.

**11.** Nor did the district court make any findings whether the collision would have occurred even if the Railroad had provided such additional warning devices as might be required for a crossing of this nature if it were unusually dangerous without them.

**12.** On remand, the district court's findings that Hales was guilty of negligence which was a proximate cause of the collision and that Illinois Central was not guilty of negligence in the operation of its train are to be taken as established. We leave it to the district court's discretion whether the further findings respecting the dangerousness of the crossing, the adequacy of the warning devices respecting it, and its effect on causation, are to be made on the basis of the existing record or on the record as supplemented by additional evidence.