618 F.2d 332
 6 Fed. R. Evid. Serv. 708
 Mrs. Jessie Mae YOUNG, Individually and as Mother, Natural
Guardian and Next Friend of Dianne Young,
Plaintiff-Appellant,
v.
ILLINOIS CENTRAL GULF RAILROAD COMPANY, Defendant-Appellee,
National Railroad Passenger Corp., Defendant.
 No. 78-1181.
 United States Court of Appeals,
Fifth Circuit.
 June 4, 1980.
 
 Richard T. Phillips, D. Briggs Smith, Jr., Batesville, Miss., for plaintiff-appellant.
 Roberson, Luckett & Robinson, Semmes Luckett, Clarksdale, Miss., for defendant-appellee.
 Appeal from the United States District Court for the Northern District of Mississippi.
 Before BROWN, GEWIN and POLITZ, Circuit Judges.
 GEWIN, Circuit Judge:
 
 
 1
 Appellant Jessie Mae Young brought a wrongful death action[1] against the Illinois Central Gulf Railroad Company (ICG)[2] following the death of her husband at one of the railroad's rural crossings. The suit was tried twice below. The first trial resulted in a verdict of $125,000 for the plaintiff but a new trial was granted due to juror misconduct. In the second trial a verdict for the railroad was returned. Appellant seeks reversal based on alleged errors of the court in (1) granting ICG a new trial, (2) excluding certain evidence, and (3) giving certain instructions to the jury. We reverse based on the erroneous exclusions of evidence and inappropriate jury instructions.
 
 The Facts
 
 2
 On the night of June 9, 1975 at about 10:00 o'clock p. m. Willie James Young, 29, was returning home after visiting with some friends. He was traveling alone in his automobile in a northerly direction toward Como, Mississippi on a public gravel road known as the "Section Line Road." ICG's railroad intersects the road on which Mr. Young was traveling from the southeast to the northwest at a fourteen degree (14o ) angle. Because of the angle a train headed northwest toward Como approaches the crossing from the right and rear of an automobile on the Section Line Road. A Panola Industries (Choctaw) plant is located down the track from the road in the direction from which a train traveling northwest would approach the crossing. Bright outdoor lighting surrounds the industrial plant. It is from these lights that the headlight of a train would emerge as it approached the Section Line Road crossing.
 
 
 3
 As the gravel road intersects the crossing it narrows to one lane because there were no timbers used in the crossing and the gravel there was "whipped out" or washed away. On both sides of the one-lane path rails are exposed six to seven inches above the level of the gravel as a result of erosion. The road also curves to the right just before it reaches the track so that in order to traverse the one-lane path and not hit the exposed rails a motorist must turn to the right just prior to crossing the railroad.
 
 
 4
 As Mr. Young approached the crossing there were no warning signs erected on the south side of the track. A "Mississippi Law: Stop" sign[3] had been knocked down in a previous collision at the crossing several weeks earlier.[4] A similar sign on the other side of the track had a dull black back and was not visible at night from the south side of the crossing. There were no other landmarks at the crossing.
 
 
 5
 Mr. Young approached the crossing at about 25 to 30 miles per hour according to the train crewmen. ICG's passenger train, the "Panama Limited", approached the crossing from the southeast at the same time traveling at 79 miles per hour.[5] The train's headlight was functioning properly but its white oscillating warning light, or "Mars light" had burned out before the train's last previous stop.[6]
 
 
 6
 When Mr. Young's car reached the crossing the train was still short of the whistle post which is located 900 feet from the crossing. The train crewmen testified that the car had plenty of time to safely cross the tracks when it arrived at the crossing. Instead of turning to the right to maneuver the narrow crossing, however, the car made a left turn onto the track in front of the train. Its right wheels ran between the rails and its left wheels ran on the outside or southwestern side of the rails. Mr. Young stopped his car approximately 125 feet from the crossing and attempted to get out. Meanwhile the train had been put into emergency at the whistle post. The speed of the train, however, made it impossible for it to stop that quickly.[7] Mr. Young was halfway out of the car when he and his car disappeared from the trainmen's view at the front of the train's engine. The train came to a stop 2500 feet northwest of the crossing. Mr. Young's car was imbedded on the front of the engine. His dead and mangled body was found about 160 feet from the crossing.
 
 
 7
 On December 4, 1975 Mr. Young's widow brought this wrongful death action against ICG alleging that her husband's death was proximately caused by the combined negligence of the railroad in the operation of its passenger train and in the maintenance of its railroad crossing. It was plaintiff's theory that the blind nature of the unmarked crossing, the poor condition of the crossing itself, the lack of the appropriate warning light on the train and the speed at which the train approached the crossing, all combined to trap Mr. Young in a position of severe danger. Plaintiff alleged that when the deceased approached the crossing nothing alerted him to the presence of the crossing or the eminence of the train. It was her position that without such a warning Mr. Young did not know to make a right turn across the track at precisely the right moment and his car was diverted by the exposed rails to the left side of the one-lane path across the track. She alleged that the speed of the train coupled with the camouflaging of its headlight among the Choctaw plant lights behind it and the absence of its Mars light then made it impossible for Mr. Young to become aware of his eminent position of danger, bring his car to a stop and escape before the train was upon him.
 
 
 8
 In the first trial of the case the jury agreed with the plaintiff's theory of the case and awarded a verdict of $125,000. While the jury was deliberating, however, one of the alternate jurors informed an attorney for the defendant[8] that the foreman of the jury had, before deliberations began, talked with the other jurors about his personal knowledge of the crossing and told them that he thought it was a bad crossing and that there had been other accidents there prior to the collision involved in this case.[9] The trial court then interviewed all of the jurors about the jury foreman's pre-deliberation comments. The court became satisfied that juror misconduct had occurred and upon proper motion, a new trial was granted to ICG. The second jury found for the railroad and awarded no damages.
 
 The Issues
 
 9
 Mrs. Young's appeal of this case is based primarily on certain erroneous evidentiary rulings and jury instructions which, she contends, gutted the case which she sought to present to the jury. She also argues that the new trial granted by the trial court for juror misconduct was erroneous because (1) the extraneous matters mentioned by the juror should have been admitted into evidence and (2) the defendant knew of the statement of the alternate juror while deliberations were still underway and failed to bring it to the attention of the court until after an adverse verdict had been returned.[10] We will first dispose of the new trial issue and then proceed to an individual examination of the evidentiary rulings and jury instructions.
 
 The Law
 
 10
 It is well settled in this circuit that motions for new trial are directed to the sound discretion of the trial court and that, absent a clear abuse of discretion, the ruling of the trial court on such a motion will not be disturbed. See Valley View Cattle Co. v. Iowa Beef Processors, Inc., 548 F.2d 1219 (5th Cir.), cert. denied, 434 U.S. 855, 98 S.Ct. 174, 54 L.Ed.2d 126 (1977); Spurlin v. General Motors Corp., 528 F.2d 612 (5th Cir. 1976); Urti v. Transport Commercial Corp., 479 F.2d 766 (5th Cir. 1973). The trial court below compiled a thorough record of interviews with jurors and meticulously limited itself to an examination of extraneous comments made to the other jurors by the jury foreman prior to the opening of deliberations in the jury room. We cannot say that the trial court abused its discretion in this regard.
 
 
 11
 The same broad discretion is vested in the trial court for the determination of whether evidence should be admitted based on relevancy and materiality. See United States v. 110 Bars of Silver, 3 Crucibles of Silver, 11 Bags of Silver Coins, 508 F.2d 799 (5th Cir.), cert. denied sub nom. Resnick v. United States, 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89 (1975). Trial courts must not lose sight, however, of the liberal nature of the Federal Rules of Evidence. It must be remembered that "(t)he federal rules and practice favor the admission of evidence rather than its exclusion if it has any probative value at all." United States v. Carranco, 551 F.2d 1197 (10th Cir. 1977); see Mathiesen v. Panama Canal Co., 551 F.2d 954, 957 (5th Cir. 1977) ("All relevant testimony is admissible unless some specific rule of evidence excludes it.").
 
 
 12
 The lower court in this case excluded various items of evidence, disallowed certain testimony and made erroneous jury instructions due in part to its erroneous exclusion of evidence. The result was that the plaintiff was prevented from presenting her case to the jury in the full and complete manner contemplated by the Federal Rules of Evidence. We must find therefore that in excluding so much of plaintiff's relevant and material evidence, the trial court committed a clear abuse of discretion.
 
 
 13
 Evidence Concerning the Condition of the Crossing
 
 
 14
 The plaintiff attempted to present considerable evidence and testimony concerning the poor condition of ICG's crossing. Much of that evidence was not allowed to be admitted by the trial court. One such category of evidence that was completely excluded was all testimony by lay witnesses who had observed the crossing after the accident relating to their observations of the condition of the crossing. The trial court repeatedly based its rulings excluding such evidence on the ground that the simple unexplained, black and white photographs of the crossing which were admitted into evidence, "spoke for themselves." This exclusion of evidence because of a preference for photographs is apparently based on Russell v. Mississippi Central Railroad, 239 Miss. 741, 125 So.2d 283 (1960). In that case, however, the Mississippi Supreme Court only ruled that lay testimony about the condition of a crossing which conflicted with photographs must yield to the physical photographic evidence. This does not mean, however, that non-conflicting evidence which enhances and explains photographic evidence should not be admitted. Testimony from lay witnesses about their observations of the crossing, its width, the difficulty they experienced in crossing it, and their impression of its general condition is relevant, material and quite probative of the condition of the crossing. While it is true that Rule 701 of the Federal Rules of Evidence limits opinion testimony by lay witnesses, that rule allows such testimony when it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." Under these criteria lay witness testimony concerning the condition of the crossing clearly should have been admitted.
 
 
 15
 Counsel for Mrs. Young also sought to present a motion picture experiment and expert testimony by Mr. Marcus Dean Williams, State Aid Engineer for the State Aid Division of the Mississippi State Highway Department. Mr. Williams' testimony would have explained the experiment and offered his expert opinion concerning the dangerous condition of the crossing. The motion picture would have shown Mr. Williams approaching the crossing from the south, just as Mr. Young did, at approximately the same speed at which Mr. Young is estimated to have approached it. The film would have demonstrated that it is very likely that if the wheels of a car are not turned to the right just before reaching the track, the car would be diverted by the rails onto the track. The trial court allowed neither the motion picture experiment nor Mr. Williams' testimony about the film nor his opinion of the danger of the crossing to be admitted into evidence.
 
 
 16
 Mr. Williams is a civil engineer with over thirty years experience in building and supervising the construction of highways. There was no question of his competency to testify as an expert in this case. His testimony, including his assessment of the danger of this particular crossing, should have been admitted. We agree with the following assessment made by the Sixth Circuit on this very question:
 
 
 17
 It is absurd to contend that the average layman has, as a matter of common knowledge, a sufficient grasp of the diverse factors which must be considered in constructing and maintaining an acutely angled railroad crossing which will afford a maximum of safety and a minimum of inconvenience to vehicular traffic and train movement.
 
 
 18
 Bridger v. Union Railway, 335 F.2d 382, 389 (6th Cir. 1966); see Fed.R.Evid. 702. The trial court erred in not allowing Mr. Williams to testify about the condition of the crossing.
 
 
 19
 The motion picture experiment was not offered to reenact the accident but was presented only to show that under the circumstances of this case it was physically possible for Mr. Young's car to have been diverted onto the railroad track. In a relatively recent case a district court in Pennsylvania displayed a logical approach to this question.
 
 
 20
 The film in question was offered to demonstrate certain principles of physics. It functioned as a graphic portrayal of the expert's oral testimony about Newton's laws of motion. . . . I saw no prejudice to the plaintiff in permitting the jury to see it. In any event, plaintiff's counsel was afforded ample opportunity to cross-examine defendant's expert and to explore the differences between what the film depicted and the accident at issue in the instant case.
 
 
 21
 Zurzolo v. General Motors Corp., 69 F.R.D. 469, 473 (E.D.Pa.1975). The film was properly authenticated and should have been admitted for the purpose for which it was offered. See Sanchez v. Denver and Rio Grande Western Railroad, 538 F.2d 304 (10th Cir. 1976), cert. denied, 429 U.S. 1042, 97 S.Ct. 742, 50 L.Ed.2d 754 (1977).
 
 
 22
 The trial court also excluded nighttime photographs which demonstrate the approach of the gravel road to the crossing. Two of the photographs portray the scene as it appeared at night with automobile headlights used for illumination after the reflectorized crossbuck signs were erected.[11] Two other photographs portray the same scene with the crossbucks covered by blankets. The photographs were properly authenticated and clearly "spoke for themselves" regarding the advanced warning of the crossing that would be given by the presence of reflectorized crossbuck signs on the one hand and the absence of such signs on the other. Nevertheless the photographer who took the pictures was available for cross-examination by the defendant. The pictures were clearly relevant and material evidence and no undue prejudice would have been imposed on the defendant by their admission. The trial court erred in failing to admit this and all of the previously discussed evidence relating to the poor condition of the crossing. See Cain v. Illinois Central Railroad, 266 F.2d 942 (5th Cir.), cert. denied, 361 U.S. 886, 80 S.Ct. 158, 4 L.Ed.2d 122 (1959).
 
 
 23
 Jury Instructions and Evidentiary Rulings Relating to
 
 Negligence in Operation of Train
 
 24
 The trial court erred in excluding other evidence which, if properly admitted, would indicate that one of his jury instructions was also clearly erroneous. One of the items of evidence excluded erroneously was an operating rule of the Illinois Central Gulf Railroad Company requiring the display of a white oscillating warning light or Mars light during all hours of operation. Counsel for plaintiff offered Rule 17(c) of the railroad's safety rules[12] for the sole purpose of presenting evidence of what the railroad itself considered to be an appropriate standard of due care. It is true that the railroad's failure to maintain the Mars light is not negligence per se since only a headlight is statutorily required,[13] and the railroad's safety rules are not incorporated into any regulatory statute. There is no reason, however, why the failure of the railroad to comply with its self-imposed reasonable standard of due care should not be received as evidence of negligence. See St. Louis-San Francisco Railway v. White, 369 So.2d 1007, 1011 (Fla.App.1979); St. Louis-San Francisco Railway v. Burlison, 262 So.2d 280 (Fla.App.), cert. denied, 266 So.2d 350 (Fla.1972); see also 30 Ala.L.Rev. 20, 43 (1978). It should have been admitted for that purpose. The court erred in failing to so admit it.
 
 
 25
 The trial court also excluded evidence of two prior collisions between defendant's train and vehicles at this particular crossing. The seminal Mississippi case on the admissibility of such evidence is Illinois Central Railroad v. Williams, 242 Miss. 586, 135 So.2d 831 (1961). There, as here, the railroad contended that the prior accidents were different from the one before the court and that evidence of them should have been excluded.[14] The Williams court noted that the "evidence was admitted for the purpose of showing notice to the railroad of the unusual danger and the existence of a dangerous condition." Id. at 605, 135 So.2d at 839; see Stoler v. Penn Central Transportation Co., 583 F.2d 896, 898 (6th Cir. 1978); Illinois Central Railroad v. Sigler, 122 F.2d 279, 284 (6th Cir. 1941).
 
 
 26
 Admission of evidence of two recent prior accidents for the sole purpose of showing that ICG had notice of an arguably dangerous crossing does not require a trial of the details and circumstances of those prior accidents. It should be considered by the jury for the purpose of determining whether a reasonably prudent railroad with notice of prior accidents at this crossing would have taken precautions against future accidents such as repair of the crossing, erection of statutorily required warning signs, maintenance of its oscillating warning light on the train engine or a reduction in train speed in light of the dangerous circumstances at the crossing.
 
 
 27
 The foregoing discussion indicates the significant amount of very crucial evidence that was erroneously excluded by the trial court relating both to the condition of the crossing and to negligence in the operation of the train. It is incredible to this court that a reasonably prudent railroad with notice of prior accidents, with knowledge of the lack of warning signs, and with awareness of the condition of the crossing would continue its run with a burned-out warning light at the maximum speed of 79 miles per hour.
 
 
 28
 Yet even in light of all of this evidence, much of which was erroneously excluded from the jury, the trial court gave the following jury instruction:
 
 
 29
 I have found that as a matter of law there was no negligence which proximately caused or contributed to Mr. Young's death in connection with the operation of the train by the train crew.
 
 
 30
 The speed at which the railroad company operated its train as it approached the crossing near which the accident occurred was reasonable and commensurate with the situation and circumstances which existed at such crossing. And in addition to that, the court has found that regardless of the speed of the train, it did not contribute in any way to this accident, because if it had been running at a good deal slower rate of speed the accident would still have occurred because of the fact that the train could not have been stopped without hitting and colliding with this automobile.[15]
 
 
 31
 This instruction is clearly erroneous and can not be allowed to stand. It is clear from all the evidence including the pictures admitted into evidence, that this crossing was an unusually dangerous one. The cases of the Mississippi courts and of this court agree that "speed in the operation of trains even at country crossings may be negligence at common law, where the conditions surrounding the crossing make it more than ordinarily hazardous or dangerous." Illinois Central Railroad v. Aldy, 185 So.2d 680, 683 (Miss.1966); see New Orleans and Northeastern Railroad v. Anderson, 293 F.2d 97, 98 (5th Cir. 1961); Cain v. Illinois Central Railroad, 266 F.2d 942, 946 (5th Cir.), cert. denied, 361 U.S. 886, 80 S.Ct. 158, 4 L.Ed.2d 122 (1959); Donald v. Gulf, M. and O. Railroad, 220 Miss. 714, 71 So.2d 776 (1954). In Anderson in which the trial court had submitted the issue of the railroad's negligence in operation of its train to the jury, this court held as follows:
 
 
 32
 The railroad is held to a degree of care commensurate with the situation created so as to avoid collision with travelers on the highway. This duty is created because where the crossing is dangerous the railroad has the duty to adjust the speed of the train. Whether the train was so operating is a jury question and was, therefore, properly submitted to it.
 
 
 33
 293 F.2d at 98 (5th Cir. 1961).
 
 
 34
 In Donald the Supreme Court of Mississippi held that a jury instruction removing the question of speed from the jury was erroneous and that in light of conclusive proof "that the crossing was a highly dangerous one and that the speed of the train was 55 miles per hour . . . there is no escape from the conclusion that the operation of the train over that particular crossing . . . constituted negligence." 220 Miss. at 721, 71 So.2d at 778; see Cain v. Illinois Central Railroad, 266 F.2d 942, 946 (5th Cir.), cert. denied, 361 U.S. 886, 80 S.Ct. 158, 4 L.Ed.2d 122 (1959).
 
 
 35
 Because so much evidence was excluded, and not subjected to cross-examination, it would be too presumptuous for this court to hold that as a matter of law the operation of the train across this particular crossing at 79 miles per hour constituted negligence. We leave that determination to the trial court upon retrial of the case. We note only that based on what has been presented before this court an instruction that as a matter of law the train was not negligent in operating at 79 miles per hour under the prevailing conditions is clearly and unequivocably erroneous. That question should at least be presented to the jury.
 
 Instruction on Duty to Stop
 
 36
 Finally we reach the court's instruction to the jury concerning Mr. Young's duty to stop at the crossing. The court gave the following instruction on this question.
 
 
 37
 Willie James Young was required by the laws of this state, when he approached the crossing near which the accident occurred, to bring the automobile he was driving to a stop at a distance of not less than fifteen feet nor more than fifty feet from defendant railroad company's nearest rail, and not proceed until he could do so safely, if the approaching train was plainly visible and in hazardous proximity to such crossing, and Willie James Young was guilty of negligence which proximately caused or proximately contributed to the collision and his death if the approaching train was plainly visible and in hazardous proximity to such crossing, and he failed to yield the right-of-way to such train.
 
 
 38
 The Mississippi legislature in 1974 changed a law requiring a stop at all railroad crossings to one requiring a stop only when a train is in hazardous proximity to the crossing and is plainly visible or when there are crossing signals giving warning of a train's approach. See Miss.Code § 77-9-249 (1972), as amended (1974). While the beginning of the court's instruction tracked the language of the statute, the instruction as a whole is inherently confusing to the jury because of the uncontroverted evidence presented by ICG's witnesses to the effect that at the time Mr. Young reached the crossing he had sufficient time to pass over it safely. That portion of the instruction stating that Mr. Young was guilty of negligence if the train was in hazardous proximity puts into question a fact that was uncontroverted at the trial. To that extent it was an erroneous instruction and should not have been given.
 
 
 39
 For all of the foregoing reasons this court must reverse and remand this cause for a new trial in accordance with this opinion.
 
 
 40
 REVERSED and REMANDED.
 
 
 
 [1]
 Mrs. Young brought this action on behalf of herself and as next friend of her four-year-old daughter
 
 
 [2]
 The suit was also brought against the National Railroad Passenger Corporation (Amtrak). The trial court dismissed Amtrak from the suit before the case went to the jury, however
 
 
 [3]
 The Mississippi statute requiring a stop sign at all railroad crossings and imposing a duty on motorists to stop regardless of whether or not a train was approaching was changed in 1974. Under the new law reflectorized railroad crossbuck signs were to be installed as the stop signs were replaced and there was no duty to stop imposed on motorists unless an approaching train posed an imminent danger to passage over the crossing. See Miss.Code §§ 77-9-247 to 249 (1972), as amended (1974). The railroad, on which the duty to replace the stop signs was imposed, had not put up the reflectorized crossbucks at the time of the accident involved here and the stop sign knocked down in the previous accident remained in a ditch alongside the road
 
 
 [4]
 While there is evidence in the record to suggest that Mr. Young was familiar with this road, we find no evidence that he had approached the crossing in a northerly direction at night since the stop sign had been knocked down three weeks prior to Mr. Young's accident at the crossing
 
 
 [5]
 Seventy-nine (79) miles per hour is the maximum speed allowed by the railroad for operation of its trains
 
 
 [6]
 The crew of the Panama Limited decided not to replace the Mars light bulb in Batesville, the last stop made before the Section Line Road crossing, because they were running several minutes late even though they had a replacement bulb on the train. It would take less than ten minutes to replace the bulb
 
 
 [7]
 Rather simple calculations reveal that no more than 7-10 seconds elapsed between the time Mr. Young reached the crossing and the time the train struck his car
 
 
 [8]
 The alternate juror actually talked with an attorney for the National Railroad Passenger Corporation (Amtrak). Attorneys for the Illinois Central Gulf Railroad claim that they did not learn of the alternate juror's statement until after the verdict was returned. See note 2, supra
 
 
 [9]
 The trial court had excluded such evidence during the course of the trial
 
 
 [10]
 See note 8, supra
 
 
 [11]
 One photograph was taken with dimmed headlights used for illumination; the other was taken with bright headlights
 
 
 [12]
 Rule 17(c) provides as follows:
 Where engines are equipped with white oscillating lights, it must be displayed to the front by day and by night, except when the headlight is inoperable it must be displayed in stationary position to replace the headlight.
 
 
 [13]
 See Miss.Code § 77-9-221 (1972)
 
 
 [14]
 The trial court in Williams admitted the evidence of prior accidents
 
 
 [15]
 The court's instruction failed to take into account the fact that Mr. Young was almost out of his car when he was struck by the train. Any appreciable reduction in speed therefore most likely would have resulted in only property damage. See note 7, supra