**Grady Lee COPELAND and Deborah Copeland, Plaintiffs-Appellants,**

v.

**GULF OIL CORPORATION, Defendant-Appellee.**

No. 81–5232.

United States Court of Appeals, Eleventh Circuit.

April 5, 1982.

Rehearing Denied May 10, 1982.

Fred W. Killion, Jr., Patricia K. Olney, Mobile, Ala., for plaintiffs-appellants.

Robert P. Gaines, Pensacola, Fla., for defendant-appellee.

Before THORNBERRY *, FAY and HATCHETT, Circuit Judges.

FAY, Circuit Judge:

Not unlike the dangers encountered by early settlers, today's pioneers in oil exploration must face daily the perils of the sea and the occupational hazards of work on offshore oil platforms. This appeal is a result of a tragic encounter with such an occupational hazard. Grady Lee Copeland and his wife, Deborah Copeland, brought this action against Gulf Oil Corporation for serious injuries sustained by Grady Copeland while working on an offshore platform. The diversity action was tried in the Northern District of Florida and resulted in a jury verdict for the defendant, Gulf Oil. The Copelands appeal the unfavorable verdict on four grounds: (1) refusal to strike a juror for cause; (2) refusal to admit proffered evidence; (3) the jury's use of a dictionary; and (4) the denial of the plaintiffs' motion for a new trial. Our review of the record convinces us that the trial judge correctly ruled on each of these issues. We affirm.

Grady Copeland worked for D & B Engineers, Inc., an independent contractor engaged by Gulf Oil Corporation to perform work on a fixed platform located on the Outer Continental Shelf in the Gulf of Mexico. Gulf Oil owned and designed the platform. On June 24, 1979, another employee of D & B Engineers leaned a "pry bar" against a chain link fence, which formed the perimeter of the upper level of the platform. The fence consisted of numerous removable sections separated by four-inch gaps.[1] Both parties stipulated that vibration from welding equipment apparently caused the pry bar to move along the fence section until it fell through one of the four-inch gaps. Grady Copeland suffered severe head injuries when the pry bar struck him as he stood in an area below.

The plaintiffs asserted two theories of recovery. First, relying on the 1978 amendments to the Outer Continental Shelf Lands Act,[2] they asserted that Gulf Oil had

---

* Honorable Homer Thornberry, U. S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. According to testimony introduced at trial, it was necessary for the sections of fence to be removable in order for Gulf to install certain drilling rigs on the uppermost platform. Apparently, the four-inch gaps were required to provide room for the permanent sockets which held the fence sections in place to be welded to the platform. Record, vol. 5, at 530.

2. In 1978, Congress amended the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333 et seq. Section 1348(b) reads in pertinent part:
   It shall be the duty of any holder of a lease or permit under this subchapter to—
   (1) maintain all places of employment within the lease area or within the area covered by such permit in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the lease holder or permit holder or of any contractor or subcontractor operating within

been negligent in failing to maintain a safe place to work and in violating the applicable federal regulation.[3] Second, the plaintiffs argued that Gulf Oil was strictly liable under the Louisiana "ruin" statute [4] for injuries caused by any defect which rendered the platform unreasonably dangerous. The trial judge submitted both theories to the jury, which found Gulf free from liability under either.

*Voir Dire*

■ Plaintiffs contend the trial court improperly refused to strike a juror for cause when on *voir dire* the juror allegedly revealed bias or prejudice. The basis of the assertion is that a replacement juror had admitted that he represented "the employer's side in injury disputes." The plaintiff's brief, however, avoids discussion of the juror's alleged bias and focuses on an allegation of general unfairness in the *voir dire* procedure employed by the District Court. We have examined both claims and find the *voir dire* procedure and the judge's refusal to excuse the juror for cause to have been proper.

The Order for Pretrial Conference set forth the proposed *voir dire* procedure. It called for the plaintiff to exercise whatever peremptory challenges it chose, accept a jury panel, and tender it to the defendant. Next, the defendant would exercise his peremptory challenges and tender an acceptable jury to the plaintiff. On the tender

back, the plaintiff was limited to challenging only jurors not originally on the panel tendered to the defendant. The defendant was then permitted the same limited option. Neither party complained of this procedure prior to nor during the jury's selection.

In implementing this plan, the plaintiff exercised all three peremptory challenges before tendering six jurors to the defendant. The defendant then exercised two of its challenges, two replacement jurors were selected, after which the defendant exercised its remaining peremptory challenge.

The plaintiffs rely on *Carr v. Watts*, 597 F.2d 830 (2d Cir. 1979) to support their contention that this procedure was unfair. We find the *voir dire* procedure in *Carr* completely distinguishable. *Carr* involved a procedure which required both parties to exercise all peremptory challenges on the first six jurors prior to the replacement of any jurors. Plaintiff's counsel requested the court to excuse the challenged jurors immediately so that each party had the opportunity to exercise remaining challenges against replacement jurors. The court denied that request as well as a subsequent request by plaintiff's counsel to retain one peremptory challenge until replacement jurors were selected.

In its opinion, the Second Circuit expounded on the importance of the peremptory challenge and cited Coke and Blackstone's characterization of it "as an essential component of a jury trial." *Id.* at 831.

such lease area or within the area covered by such permit on the outer Continental Shelf; (2) maintain all operations within such lease area or within the area covered by such permit in compliance with regulations intended to protect persons, property, and the environment on the outer Continental Shelf .... Counsel for the plaintiffs attempted to argue that the amendments made the lessee of an offshore platform an insurer of anyone who worked on it. The District Court refused to give the statute such a broad interpretation. While we recognize the heavy emphasis the statute places on safety, we agree with the District Court that the statute does not go so far as to make insurers of lessees.

**3.** United States Coast Guard regulations set the standards for construction of offshore oil platforms. According to the facts of this case, the

only relevant regulation concerned the construction of guardrails along the perimeter.

> Except for helicopter landing decks ... and areas not normally occupied, the unprotected perimeter of all floor or deck areas and openings shall be rimmed with guards and rails or wire mesh fence. The guard rail or fence shall be at least 42 inches high. The two intermediate rails shall be so placed that the rails are approximately evenly spaced between the guard rail and the floor or deck area: Provided, that if a toe board is installed then one of the intermediate rails may be omitted and the other rail placed approximately half way between the top of the toe board and the top guard rail.

33 C.F.R. § 143.15–1(a) (1980).

**4.** La.Civ.Code Ann. art. 2322 (West 1979).

There can be no doubt as to the veracity of this characterization, but the procedure employed in the instant case does not equal the severe limitation of the peremptory challenges in *Carr.*[5]

According to the District Court's memorandum decision, in this case, the procedure used had been in effect for several years and had never been challenged. This alone does not place a stamp of approval on the procedure, but in light of its implementation in this case, we find the procedure well within the bounds of due process.[6]

■ After each side had exercised its peremptory challenges, plaintiff's counsel submitted a challenge for cause against a replacement juror, Mr. McBride. Counsel stated that Mr. McBride had "indicated a propensity to represent the employer's side...." Record, vol. 4, at 19. During *voir dire* the trial court adequately questioned Mr. McBride to assure his impartiality in rendering a verdict.[7] Mr. McBride's answers alleviated any concern over his impartiality. Our reading of the *voir dire* convinces us the trial court correctly refused to strike the juror for cause.

As the United States Supreme Court recently noted,

The safeguards of juror impartiality, such as *voir dire* ... are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences....

*Smith v. Phillips,* —— U.S. ——, ——, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). In the present case the "watchful" trial judge assured both parties of the process due them during *voir dire.*

### The Proffer

■ During the trial plaintiffs made a substantial proffer consisting of deposition testimony of Gulf's safety supervisor, numerous interrogatories answered by Gulf, and two safety manuals. They attempted to establish that despite the clear language of the contract between Gulf Oil and D & B Engineers, which designated D & B Engineers as an independent contractor, Gulf Oil maintained control of D & B's employees. The plaintiffs argued that Mr. Deich, Gulf's safety supervisor, had testified in his deposition that he maintained the power to hire and fire D & B employees. According to the plaintiffs, this demonstrated that Gulf retained control, and thus manuals solely applicable to Gulf Oil employees were now made applicable to employees of Gulf's independent contractor, D & B Engineers. One manual issued by the Offshore Operators Committee was entitled Manual of Safe Practices in Offshore Operations. The plaintiffs contended that this manual demonstrated a joint effort by all offshore companies to encourage safe working habits and that safety meetings were part of an industry standard. The second manual was Gulf's own safety manual, which required safety meetings to be held. The plaintiffs theorized that Gulf's failure to make sure D & B Engineers held safety meetings proximately caused Grady Copeland's injuries.

---

5. As noted in the defendant's brief, the other cases relied on by the plaintiffs are inapposite to the issue before us.

6. Apparently, plaintiff's counsel shared this attitude prior to the return of an unfavorable verdict, since they did not enter an objection.

7. JUROR McBRIDE: Your Honor, as office manager oftentimes I represent the employer's side of such disputes and—
THE COURT: You represent what, sir?
JUROR McBRIDE: I represent the employer's side in injury disputes.
THE COURT: I see.

JUROR McBRIDE: And if this would bear on it, I just want to bring it out for the record.
THE COURT: I need to ask you whether it would bear on it. Your obligation, if selected as a juror here, would be to base your verdict in this case purely and solely on the evidence as it comes to you in the case and on the law as I give it to you. Can you do that, laying aside any experience you may have had because you've had some experience one way or the other in handling various disputes.
JUROR McBRIDE: Yes, as presented here. Your Honor. Yes.
Record, vol. 4, at 15–16.

The trial court ruled that the contract established D & B Engineers as an independent contractor and was controlling despite anything said by Mr. Deich.[8] Further, the trial court found a lack of evidence to support any causal connection between the holding of safety meetings and the injury sustained by Grady Copeland. Thus, the court found the manuals irrelevant.[9]

The admissibility of evidence lies firmly in the discretion of the trial judge. "While Fed.R.Evid. 401 defines 'relevant evidence' quite broadly, the Fifth Circuit rule, which we have continued under the new Federal Rules of Evidence, is that 'the trial court's rulings on relevancy and materiality of evidence will not be disturbed absent a clear showing of an abuse of discretion.'" *Richardson v. McClung*, 559 F.2d 395, 396 (5th Cir. 1977), quoting *United States v. Brown*, 547 F.2d 1264, 1266 (5th Cir. 1977).[10] The trial court found the plaintiff's proffer irrelevant. We have examined in detail the lengthy and voluminous material included in this proffer and agree. There certainly was no abuse of discretion.

*The Dictionary*

After retiring to deliberate, the jury requested a dictionary. The trial judge discussed the request with counsel and instructed the deputy marshal to ask the jury to "write out the reason why they want a dictionary and the purpose they want to use it for." The deputy marshal returned with a note from the jury foreman stating: "The jury Copland [sic] vs. Gulf requests a dictionary so that the juirors [sic] may look up certain words contained in (33 C.F.R., SEC 143.15–1(a))." [11]

A colloquy between the judge and counsel followed. The regulations were checked to determine whether they contained any technical definitions within the pertinent subpart; none were discovered to apply to that particular regulation. The alternative of defining particular words to them was vetoed as the judge believed that would interfere with the jury's deliberations. Oddly enough, plaintiffs' counsel provided the dictionary and suggested that a record be made of the particular book to be used— Webster's Seventh New Collegiate Dictionary. Thereafter, plaintiffs' counsel noted his objection, stating he preferred to send in only the definitions of specified words.

"Once a jury has retired to its room to deliberate upon its verdict, nothing further should reach it in any form unless by order of the court in strict conformity with established jury trial procedure." 6A Moore's Federal Practice ¶ 59.08[4] (2d ed. 1979). In this case, the trial court permitted the jury to use the dictionary only after discussing the issue with counsel and determining that the dictionary provided the best solution to the jury's plight without invading its sanctity. Several courts have been presented with this issue and the results have been as varied as the courts which have confronted it.[12] In each case, however, the controlling factor has been a showing of prejudice re-

8. Record, vol. 4, at 292–97.

9. Record, vol. 5, at 450. The plaintiffs suggest the trial court erred in several other rulings which excluded evidence concerning Gulf's knowledge of the accident, of the possibility of objects falling through the gaps, and of prior accidents. We have reviewed the plaintiff's proffer and find no reversible error in the trial court's rulings.

10. On October 2, 1981, this Court sitting *en banc* adopted all existing precedent in the United States Court of Appeals for the Fifth Circuit on September 30, 1981, as its own. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

11. This regulation formed the basis of the plaintiffs' negligence theory of liability and articulated the Coast Guard's requirements for guardrails on offshore platforms. For the text of the regulation, see note 3, *supra*.

12. *See United States v. Gunter*, 546 F.2d 861 (10th Cir. 1977) (use of dictionary did not constitute reversible error); *Dutton v. Southern Pacific Transp.*, 561 S.W.2d 892 (Tex.Civ.App.) (not prejudicial error), *rev'd on other grounds*, 576 S.W.2d 782 (Tex.1978); *Wilson v. State*, 495 S.W.2d 927 (Tex.Cr.App.1973) (harmless error); *Harris v. Deere & Co.*, 263 N.W.2d 727 (Iowa 1978) (did not require new trial). *But see, Grissinger v. Griffin*, 186 So.2d 58 (Fla. App.1966) (reversible error); *Nichols v. Seaboard Coastline Railway*, 341 So.2d 671 (Ala. 1977) (prejudice as a matter of law); *Gertz v. Bass*, 59 Ill.App.2d 180, 208 N.E.2d 113 (1965) (prejudice found). *See also*, Annot., 54 A.L. R.2d 738 (1957).

sulting from the use of the dictionary. We have reviewed the dialogue between the judge and counsel concerning this issue, we have examined the relevant regulation and the definitional sub-sections, and we have consulted the dictionary. We find that under the circumstances presented, the plaintiffs have failed to carry their burden of establishing prejudice.[13] There has been no showing that the definitions of any words within the regulation vary from their common ordinary meaning—the very meaning to be given terminology that lacks a legal definition. In recognition of this void, we decline to hold that error has been committed.

*New Trial*

Plaintiff's last issue concerns the trial court's denial of their motion for a new trial. "It is well settled in this circuit that motions for new trial are directed to the sound discretion of the trial court and that, absent a clear abuse of discretion, the ruling of the trial court on such a motion will not be disturbed." *Young v. Illinois Central Gulf Railroad Co.*, 618 F.2d 332, 336 (5th Cir. 1980). *Accord, Martinez v. Food City, Inc.*, 658 F.2d 369 (5th Cir. 1981). This is true " 'even though there may be substantial evidence which would prevent the direction of a verdict.' " *Weingart v. Allen & O'Hara, Inc.*, 654 F.2d 1096, 1102 (5th Cir. 1981). There is ample evidence in this record to support the jury's verdict. The issues were put to the jury fairly and properly resolved. There was no basis for granting a new trial.

We affirm.

---

13. The plaintiffs suggest they were caught in a "catch-22" because the trial court required them to show prejudice resulting from the jury's use of the dictionary, and then denied them the opportunity to interview the jurors concerning this issue. However, the plaintiffs' memorandum accompanying their motion for leave to interview jurors did not concern the dictionary issue, but rather concerned the possibility that Juror McBride (the same juror complained of in the *voir dire* allegation) alerted other jurors to the existence of worker's compensation benefits. Record, vol. 2, at 374 & 377–80. We fail to see how plaintiffs consider this attempt to interview the jurors equivalent to an interview concerning the jury's use of the dictionary. Rather, it appears the plaintiffs are trying to play a new game of catch-22 with this court.