[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-13350
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 18, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-60307-CR-WPD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES L. BIANCO, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(May 18, 2006)**

Before BIRCH, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

James L. Bianco, Jr., appeals his convictions for wire fraud, mail fraud, and

money laundering, in violation of 18 U.S.C. §§ 1343, 1341, 1957. He contends that the district court abused its discretion when it admitted evidence that, at the time of the offense, Bianco was serving probation, paying court-ordered restitution, and under an injunction. Because this was direct evidence of the offense and of his intent to defraud and was not overly prejudicial, we AFFIRM Bianco's conviction.

## I. BACKGROUND

Bianco solicited substantial amounts of money from various investors across the country for a payday loan and check cashing business. He failed to tell investors, inter alia, that he was on criminal probation in a Florida state court case, he owed restitution under that case, he was subject to a United States District Court for the Southern District of Florida injunction barring him from promoting business opportunities to the public, and that neither he nor his company were licensed to provide the services advertised. He was indicted by a grand jury for eleven counts of wire fraud, twelve counts of mail fraud, and four counts of money laundering. The indictment alleged that he knowingly and willfully defrauded approximately seventy-nine investors of over $1,600,000. Specifically, it stated that Bianco, by means of telemarketers, "made and caused others to make materially false statements and omissions of material facts to investors, including . . . [omitting the fact that he had never] applied for a license with the State of

2

Florida to operate a check cashing business . . . [and that] it was unlikely [he] would have received such a license if he had applied, due to the fact that he was a convicted felon." R1-1 at 3-4. Moreover, Count 26, one of the money laundering counts, specifically referenced a check for $55,000.

Prior to trial, the government disclosed that it intended to offer, pursuant to Federal Rule of Evidence 404(b), "records and/or testimony regarding [Bianco's] plea, sentencing and probation in [a Florida state court case] . . . to show that [he] utilized funds from [his company, which was the same company involved in the instant offense,] for his own personal benefit . . . to pay a portion of the court ordered restitution," as well as "evidence and/or testimony regarding the fact that [Bianco] was under a court ordered injunction . . . against the solicitation of funds for business opportunities and income-generating products and services at the time of the commission of the instant offense . . . to show that [he] made false statements and omissions of material fact with respect to victims in this case, as alleged in the indictment." R1-27 at 1-2.

Bianco then filed a motion in limine, asking the court to deny the admission of the evidence disclosed by the government, supra. He argued that the evidence was prohibited under Rule 404(b) because it was remote in time, factually dissimilar, and its probative value was outweighed by the potential for jury

3

confusion.

The government filed a response to Bianco's motion, arguing that all of the evidence at issue was "relevant to the fraud scheme charged in the indictment, and the probative value of the evidence [was] not substantially outweighed by its prejudicial effect." R1-33 at 1-2. Specifically, the government argued that Bianco had an affirmative duty to disclose his legal disabilities and impediments affecting his role as president of his company, and that he failed to tell his investors that he had not attempted to get a check cashing business license because he knew he would not be able to get one due to his criminal background. The government further argued that the evidence was not governed by Rule 404(b) because it was intrinsic to the offense charged, as the $55,000 check referenced in Count 26 of the indictment used victims' money to pay off his court-ordered restitution.

At trial, prior to selecting the jury, the court questioned the parties on Bianco's motion and the government's response. The government explained that it was not offering the evidence as similar fact evidence, but to show Bianco's background, which he had fraudulently misrepresented and omitted in his representations to the victims. When the court challenged the government to explain why the evidence of a prior fraud scheme conviction would not be prohibited by Federal Rule of Evidence 403, the government conceded that it did

4

not need to "refer to it as an organized scheme to defraud . . . [but] would be satisfied if [it] could just establish the fact [that Bianco] had a criminal case in which he was on probation," which would allow the victims to testify that if they had known that, they would not have invested in the company. R10 at 7. The government further argued that the evidence of the injunction would show that Bianco "deliberately avoid[ed] getting a license because he knew . . . he would not have been eligible." Id. at 8.

The court then challenged Bianco to explain why, if there was no reference as to why he was on probation, "the fact that he was on probation and was ordered to pay restitution" and paid some of his restitution out of the solicited funds would not be relevant. Id. at 8-9. Bianco responded that he did not think that the jury needed to know that he was paying restitution at all, as long as they knew he had converted the funds for his own use. The court then ruled that "the fact that he was on probation and paying restitution . . . and . . . had been ordered . . . not to engage in business opportunities" was relevant, but prohibited any mention of why he was on probation. Id. at 10. Subsequently, the court entered a written order, stating simply that Bianco's motion in limine was "[d]enied, except as to the nature of the prior felony conviction." R1-36.

During opening statements, the government asserted that Bianco had made

"[o]missions of important information" to the investors, R8 at 10, including the fact that he did not have a license to run the check cashing business he was proposing, and that "he was on probation in a criminal case in South Florida[,] that he had restitution monies that he owed[,] and that . . . in a civil federal district court case that there had been an order . . . called a permanent injunction [that] . . . permanently prohibited [him] from engaging in an enterprise raising money from the general public," id. at 22.

Testimony at trial by some of Bianco's victims established that, beginning in at least June 2001 and continuing into 2002, individuals representing a company called ACE Payday Plus, LLC ("Payday"), made unsolicited telephone calls to prospective investors around the country. The telemarketers represented that Payday had been formed to purchase and maintain stores offering "payday loans," check cashing, and other services. They, and the documents they sent to investors, further represented, or allowed the investors to believe, that Payday was licensed under Florida law to perform this service.

The telemarketers also led the investors to believe that the company had an experienced management team, including Bianco and Chester Potash. Further, the investors were led to understand that the sales commission was only 10% of the investment. Bianco sent those who invested a letter welcoming them to the

6

company and a certificate of membership, both signed by Bianco as president of Payday. On cross-examination, one of the witnesses admitted that the written materials sent to him by Payday did say that the company was "newly organized and ha[d] no operating history," but contended that this was not what the telemarketers stated. R12 at 38.

The government asked each of the witnesses whether they had been told that Bianco had a criminal background or history, was on criminal probation in a Florida state court case, and was subject to an injunction prohibiting him from offering investment opportunities to the public. They all replied that they had not been told that, and that, if they had, they would not have invested in Payday. The government also asked two of the witnesses whether they would have invested in Payday had they known that the company was not licensed to do business as a check cashing service, and both replied "[a]bsolutely" not. R11 at 179; R12 at 103.

The government next called four telemarketers, three of whom testified that they were paid 35-40% commissions. On cross-examination, one of the telemarketers admitted that he and others were knowingly making false statements regarding the product, but called it "over-selling" and considered it "[p]art of the sales business." R13 at 31-32. Jacque Rene testified that he sold his check cashing

store, called Payday, Inc., to Bianco in August 2001 for $45,000.

Out of the presence of the jury, the government moved to admit its Exhibit 24, the records of the Florida state court case that resulted in Bianco's probation and restitution. The court suggested that only one of the pages was necessary, as it indicated the probation sentence, the restitution amount, was signed by both Bianco and the state court judge, and did not indicate the nature of the felony committed. Bianco's counsel objected, arguing that, as the page indicated that Bianco owed restitution to multiple defendants, it allowed for the inference that the underlying crime involved fraud. Counsel further argued that Bianco would stipulate that he had owed restitution due to a criminal matter in Florida state court and that the restitution was paid out of his bank account. The court accepted that the document might allow an inference of multiple victims, but denied that that made it inadmissable and, over additional objections by Bianco, admitted the exhibit with the provision that it would tell the jury that the document stemmed from a "withhold adjudication." R14 at 10-12.

The government then moved to admit its Exhibit 25, the injunction order issued by United States District Court Judge for the Southern District of Florida, Ursula Ungaro-Benages against Bianco. Bianco objected and offered to stipulate to the injunction, thereby preventing the jury from making any inferences.

Ultimately, the judge allowed into evidence "the style, the title of the order, Roman Numeral III and the Judge's signature." Id. at 15.

Potash testified that: (1) he was a teller at a check cashing store; (2) Bianco paid him $10,000 to be a consultant; (3) he shared his business procedures with Bianco, but was not involved in the formation of Payday or in the fund raising and was never a manager of the company; and (4) he wrote a biographical sketch and lied to Bianco about having a Ph.D., but did not hold himself "out to be one of the industry leading experts in the check cashing industry," as represented in the Payday materials. R15 at 53-59. On cross-examination, Potash admitted that, if the business had been run correctly, the investors should have gotten their investment back.

Omar Rodriguez, an investigator for the Florida Department of Banking and Finance, testified that he investigated Payday based on a complaint filed with his department in September 2001. Rodriguez testified that Bianco admitted to "seeking investors to get together enough money to purchase" a check cashing business, but denied that he was conducting such a business at that time. Id. at 162. Bianco told Rodriguez that he knew he needed a license to run such a business and explained that he intended to obtain such a license. Bianco did not tell Rodriguez that he already was running a store.

9

An administrator from the Florida Office of Financial Regulation testified that, to get a check cashing license, a person had to make an application that disclosed any criminal record and civil litigation in which the applicant was involved as a defendant and any business in which the applicant was involved that had an administrative complaint filed against it. He testified that no record of any application or license for Payday or Bianco existed.

A staff attorney with the Securities and Exchange Commission ("SEC") testified that the SEC initiated an action against Payday and Bianco in March 2002. Their investigation revealed that 79 individuals had invested in Payday. Other SEC investigators testified that they had traced investor funds through multiple bank accounts held by Bianco, and that Bianco had used some of the funds to buy his wife a Mercedes-Benz and to pay off $55,000 of his restitution obligation.

During this testimony, the government published its Exhibit 24, the Florida state court record indicating Bianco's probation and restitution, and the court gave the following instruction to the jury:

> Let me mention to the jury that in state court they have something called a "withholding of adjudication of guilt," and that's what happened to Mr. Bianco's case, which means he is not considered to have been convicted of that crime at that time. Now, you just heard evidence of acts of Mr. Bianco, which were allegedly committed on other occasions. You must not consider any of this evidence in deciding if the defendant committed the acts charged in the [i]ndictment. However, you may consider this evidence for other very

10

limited purposes. If you find beyond a[] reasonable doubt from other evidence in the case that the defendant did commit the acts charged in the [i]ndictment, then you may consider evidence of other allegedly committed acts as to determine whether Mr. Bianco had the state of mind or intent necessary to commit the crime charged in the [i]ndictment.

R16 at 139. Following the court's instruction, the government asked the witness "[a]nd, again, this one document simply shows on that date there was an order of probation and an order of restitution, correct?" Id. at 139. To which the witness replied, "[c]orrect." Id. at 140.

After the government rested its case, the court, on the government's motion, dismissed one of the mail fraud counts because the victim in that count had not testified. Thereafter, without offering any evidence, the defense also rested.

During its closing argument, the government strongly emphasized, repeating it twice, that the investors were not told that, at the time of the fraud, Bianco was:

on probation in a criminal case, that he had an outstanding order of restitution against him that he hadn't paid yet, and, furthermore, that he was under a court-ordered injunction that had been issued in early 2001. . . . [T]hese [were] material facts that should have been disclosed to investors if there was a legitimate operation. But we know it wasn't a legitimate operation. This information wasn't disclosed to these victims and that's why they lost their money.

R17 at 11. Later, the government walked the jury through its Exhibit 25, first noting that the injunction had been entered in February 2001, before Bianco started soliciting investors for Payday. It highlighted that the injunction permanently

11

barred Bianco from "engaging or participating in the advertising, marketing, promotion, offering for sale or sale of any franchise, business venture, business opportunity or income generating product or service." Id. at 21. It reasserted that Payday was exactly the kind of operation barred by the injunction. The government also argued that Bianco did not apply for a license because he knew he would not get one due to his criminal background and the injunction and that this was "a fraudulent omission of important information." Id. at 31.

In his closing argument, Bianco's counsel laid out a "good faith defense," explaining that Bianco had "dream[ed] to go out and begin a corporation, to begin a business idea," and that "he needed to raise money in order to start that business." Id. at 34. He argued that Bianco took steps to keep his telemarketers honest, but the investors only briefly looked at the printed materials and did not take enough care in their decision to invest. He then pointed out that Bianco had "put an awful lot of negative material" in the materials he sent to investors, and questioned what good including his criminal history and the injunction would have done. Id. at 45. Later, he argued that the government had told the jury that Bianco used some of the investor money to pay restitution "as an incendiary piece of information. It's offered for its emotional appeal, because in truth [Bianco] . . . was permitted to take money out of this company." Id. at 60. Finally, counsel

12

argued that it would not have made a material difference had Bianco disclosed the injunction because the investors would not have read the information, even if it had been included in the materials.

In rebuttal, the government asked how Bianco could have been acting in good faith when he was violating the court-ordered injunction and operating without the proper license. Thereafter, out of the presence of the jury, the court redacted the words "due to the fact that he was a convicted felon" from the indictment. Id. at 83-85. At the close of the trial, the court repeated the instruction it gave the jury regarding the evidence of prior acts. Ultimately, the jury found Bianco guilty on all counts, and the court sentenced him to 168 months of imprisonment.

## II. DISCUSSION

Bianco argues that the court erred by admitting the evidence of his status on probation, his restitution obligation, and the court-ordered injunction because it was not probative of the offenses charged and unfairly invited the jury to disregard his good faith defense, particularly the fact that the business could have been profitable if well-run, that the promotional materials explained the risks, and that the telemarketers lied independently. Specifically, he argues that the evidence was unduly prejudicial because it: (1) could lead the jury to infer that he was guilty and

13

had a propensity for fraud because he had been previously convicted of similar crimes and (2) aggravated his culpability, but was irrelevant as to his guilt. He also argues that the issue of whether he could have gotten a license was not important enough to justify the evidence and that the jury did not need to know that he was paying restitution with the investor's funds, as long as they knew that he converted it to his own use.[1]

We review properly preserved challenges to the district court's rulings on admission of evidence for an abuse of discretion. United States v. Jiminez, 224 F.3d 1243, 1249 (11th Cir. 2000). A court abuses its discretion when its decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." United States v. Baker, 432 F.3d 1189, 1202 (11th Cir. 2005), cert denied sub nom., __ U.S. __, __ S. Ct. __, 2006 WL 654797 (U.S. Apr. 17, 2006) (No. 05-9687).

Evidence showing "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would [otherwise] be" is "[r]elevant evidence," and "[a]ll relevant evidence is [generally] admissible" at trial. Fed. R. Evid. 401, 402. However, even if evidence

[1] Bianco additionally contends that his failure to disclose his probationary status and other omissions were not directly relevant to any of the charged offenses because the indictment did not include any allegations of material omissions. In fact, the indictment does include such allegations. R1-1 at 2.

14

is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403.

Both the "rules and practice favor the admission of evidence rather than its exclusion if it has any probative value at all." Young v. Ill. Cent. Gulf R.R. Co., 618 F.2d 332, 337 (5th Cir. 1980) (quotations omitted). Rule 403 is an "extraordinary remedy . . . which should be used sparingly since it permits the trial court to exclude concededly probative evidence." United States v. Wright, 392 F.3d 1269, 1276 (11th Cir. 2004) (quotations omitted), cert. denied, __ U.S. __, 125 S. Ct. 1751 (2005). Rule 403's "major function [is] excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." United States v. Utter, 97 F.3d 509, 514-15 (11th Cir. 1996) (quotations omitted).

Rule 404(b) prohibits all evidence of "crimes, wrongs, or acts" to prove that a person is of a character that would commit the crime charged, but it permits such evidence to prove, among other things, motive, intent, or absence of mistake or accident. Baker, 432 F.3d at 1204. If (1) the evidence is relevant to one of these elements, (2) there is "sufficient proof that the defendant committed the prior act, and [(3) the government] can show that the probative value of the evidence is not

15

substantially outweighed by its undue prejudice, and [it] meets the other requirements of [Rule] 403," then it may be admissible under Rule 404(b). Id. at 1205. Rule 404(b) "is a rule of inclusion." Id. at 1204-05. "Evidence of criminal activity other than the charged offense is not extrinsic under Rule 404(b) if it is . . . necessary to complete the story of the crime, or [is] . . . inextricably intertwined with the evidence regarding the charged offense." Wright, 392 F.3d at 1276 (quotations omitted).

To prove mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, the government must establish that the defendant: (1) intentionally participated in a scheme to defraud a person of money or property, and (2) used the mails and interstate wires in furtherance of the scheme. See United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006); United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003). "A scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material facts, reasonably calculated to deceive persons of ordinary prudence." Hasson, 333 F.3d at 1270-71 (citations omitted).

Bianco contends that United States v. Cook, 557 F.2d 1149 (5th Cir. 1977), is dispositive. In Cook, the defendant, by the actions of his company, was charged with mail fraud by making untrue statements to potential investors. Id. at 1150-51.

16

Over the defendant's objection, the district court admitted into evidence unredacted "injunction documents" that related to another company the defendant had previously owned. Id. at 1151-52. These documents prohibited the selling of securities in a manner violative of federal law and listed a number of acts that would constitute fraud if the defendant engaged in them. Id. Citing Rule 403, we reversed the defendant's conviction because the documents "had little or no independent probative value in relation to any disputed question in the case" and "describing numerous fraudulent acts was . . . likely to have had a significant prejudicial impact on the minds of jurors." Id. at 1153, 1155. We reiterated, however, "that Rule 403 requires that each case be decided on its own facts [and that] [s]ituations involving a danger of prejudice are not susceptible to general rules." Id. at 1154 n.10.

Here, the challenged evidence against Bianco satisfies the three-pronged admissibility test under 404(b). With regard to the first prong, Bianco was indicted, in part, for making material omissions, which include the failure to tell the investors the fact that he was on probation, that he owed restitution, and that he was enjoined from, among other things, soliciting investments from the public, These facts make up elements of the offense and are either necessary to understanding the "story of the crime" or "inextricably intertwined" with other

17

direct evidence of the offense. See Wright, 392 F.3d at 1276. Unlike the defendant in Cook, the evidence of his status on probation and the injunction entered against him had substantial, independent probative value as to his intent and absence of mistake in omitting material facts in furtherance of the offense. See Cook, 557 F.2d at 1153-54. Additionally, evidence concerning the payment of his restitution obligation was intrinsic to the charge of money-laundering. The fact that his criminal background prevented him from obtaining the necessary license to operate his business is also necessary in understanding the scope of Bianco's deception because investors were led to believe that his company had such a license.

The second prong under 404(b) was not contested below, and is not contested here, and is satisfied in as much as Bianco was willing to stipulate to his state court criminal record and the existence of the injunction. As to the third prong, because the district court carefully restricted and redacted the evidence such that no direct references were made to the nature of Bianco's prior criminal offenses and twice instructed the jury on the proper use of the evidence, the danger of unfair prejudice was minimal as compared to its probative value. See United States v. Calderon, 127 F.3d 1314, 1334 (11th Cir. 1997) (the court's instructions cure prejudice because the jury is presumed to follow them). The district court did

18

not abuse its discretion in allowing in evidence regarding the lack of a business license and the fact that $55,000 of laundered money was used to pay restitution because such evidence was not used to prove that Bianco had a criminal propensity, but rather to provide a complete and necessary account of the circumstances underlying Bianco's various offenses.

## III. CONCLUSION

Bianco argues that the contested evidence against him was highly prejudicial and any probative value was far outweighed by its prejudicial impact. We disagree and conclude that it was not an abuse of discretion for the district court to admit such evidence. **AFFIRMED.**