**Arthur COLLINS, By and Through J. Benjamin KAY, III, as guardian ad litem, Plaintiff-Appellee,**

v.

**SEABOARD COAST LINE RAILROAD COMPANY, Defendant-Appellant.**

No. 81–7408.

United States Court of Appeals, Eleventh Circuit.

May 10, 1982.

---

Nixon, Yow, Waller & Capers, John B. Long, Roy D. Tritt, Charles C. Stebbins, III, Augusta, Ga., for defendant-appellant.

Thomas R. Burnside, Jr., James B. Wall, Augusta, Ga., for plaintiff-appellee.

Before TUTTLE, HENDERSON and CLARK, Circuit Judges.

TUTTLE, Circuit Judge:

The Railroad appeals from a judgment against it, following a crossing accident, principally on alleged errors of the trial court in the admission and exclusion of evidence.

The facts as admitted by the trial court, would warrant a jury's findings to the following effect:

The accident occurred in an industrial area just west of the city limits of Augusta, Georgia, where a fairly busily used highway crossed the Seaboard's tracks. There were two tracks, one of which was for through trains and the other for storage of cars for switching. There were the standard cross-arm stop signs, 15 yards and 50 yards respectively from the nearest track, as required by the Georgia statute. There were no "active" signals, such as flashing lights or a bar to stop automobile traffic on Claussen Road. The Railroad's speed limit for this crossing was 47 miles per hour; the train was traveling a short distance before crossing the road between 55 and 60 miles per hour.[1] The crossing was a dangerous one, so that any train speed in excess of 25 miles per hour would have created an unsafe condition. Arthur Collins, the plaintiff, stopped his truck at the first stop sign and he slowed down to two or three miles per hour at the second stop sign, he then rolled onto the tracks at which time his motor choked up and the train struck him on the right hand side of his cab. He did not see the train before it struck. The train continued for 40 car lengths, with all its emergency brakes operating, before it came to a stop. Collins was seriously injured, resulting in two periods of hospitalization and surgery during one of which he became mentally incompetent. A guardian ad litem was appointed for him by the district court. He was totally and permanently disabled. The jury could reasonably find in his favor the sum of $258,218.86 (reduced by the court by $5,000 representing benefits received by the plaintiff from his employer's personal injury protection insurance).

## I. STATEMENT OF THE ISSUES[2]

1. The trial court erred in admitting evidence of a racially derogatory and highly prejudicial remark allegedly made by one of Seaboard's employees after the accident, which was not relevant to any issue in the litigation.

2. The trial court erred in prohibiting Seaboard from referring in opening statement or cross-examination to Collins' damaging admissions and by refusing to allow Seaboard during its own case to recall Dr. Kmiecik to testify as to Collins' competency at the time of said admissions.

3. The trial court erred in admitting evidence of subsequent collisions at the scene of the accident, where no evidence was offered to show either that the crossing and scene were unchanged or that the subsequent collisions occurred under similar conditions, and where the "evidence" was pure hearsay.

4. The trial court erred in allowing a so-called "human factors" expert to testify on matters not properly the subjects of expert testimony.

5. The trial court erred in allowing Collins to read into evidence Requests for Admissions propounded by Seaboard to Collins, and Collins' responses thereto.

6. The trial court erred in admitting evidence of Collins' blood alcohol test when his sobriety was not in issue.

7. The trial court erred in denying Seaboard's Motion for New Trial since the verdict was against the great weight of the evidence and was the result of bias, prejudice or mistake.

## II. DISCUSSION OF ISSUES

1. *Evidence of a racially derogatory remark allegedly made by one of Seaboard's employees*

The court heard an objection *in limine* to the admission of such part of the expected testimony of a witness named Boyd as

[1] Of course, there was competent evidence by the train crew that the train was not exceeding 40 miles per hour, and in fact, was proceeding at about 35 miles per hour. We are here reciting only what the jury could have found if they had believed the testimony most favorable to the plaintiff, as we must.

[2] As stated by the appellant.

would state that he heard a statement by a person he took to be a member of the train crew: "We were standing there, watching them put Arthur in the ambulance and watching the police and one of these fellows said, 'there goes one more damn driver who is not going to cross this track without looking.'" The trial court overruled the objection. Then, before the jury, the following testimony was given by Boyd:

When I jumped the track to go to the car there were a group of men, there were two or three men standing around and one of them had a radio on his hip, it was one of these two-way mobile radios.

What caught my attention was the radio, somebody was talking on the radio from down where the engine was, there was still some fire around the engine, where the truck had been dragged and they were saying they needed some help down there to put the fire out.

Q: What happened then?

A: Well, I looked back, and even then, they were still busy loading Arthur onto the ambulance. And then—

MR. LONG: Your Honor, I would like to renew my objection to the statement that the witness is about to make and would incorporate all the previous remarks I have made, with regard to my objection to this line of inquiry.

THE COURT: Your objection is overruled and it is noted on the record.

Q: (By Mr. Burnside) You may continue.

A: Then, this guy who had the radio said, "There goes one damn driver who's not going to be crossing the tracks without looking anymore."

Q: Were those his exact words?

A: Well, his exact words were "There goes one damn nigger who's not going to be crossing the tracks without looking anymore." That really stuck in my mind and I turned around, I was walking to my car and I said, "That's a hell of a thing to say, you probably just killed a man." And then I walked back to my car.

Q: What response did the man make?

A: I don't remember there being a response.

Q: Can you identify this individual?

A: I don't know, it's just been a long time, that remark just stuck in my mind.

Subsequently, from testimony of the Railroad engineer and the conductor it was established that the conductor was in communication with the engineer about the possibility of the engine blowing up. It was also established by the engineer's testimony that at the time Collins was placed in the ambulance he did make a comment. He said: "I am sure I said something like 'I'm sorry to see the man hurt and I hope he lives.'" It is thus clear that the evidence is undisputed that Wilson, the conductor, was at the scene of placing Collins in the ambulance and that he there made a statement in connection with the accident. There was only a dispute as to what he said. This was an issue of credibility for the jury to resolve.

With respect to the racial identification of Collins, as is evidenced by the part of the transcript quoted above, the defendant made no objection, made no motion to exclude the statement and, of course, made no motion for a mistrial. It will be noted, of course, that this word was not used by the witness Boyd when he made his statement to the trial judge out of the presence of the jury. The objection then made by the defendant was solely on the basis of relevance and on the ground that the prejudicial effect of such a statement greatly outweighed its evidentiary value under F.R.Ev. 403. However, noting the defendant's ground of objection actually made *in limine*, the court charged the jury at that point that having heard the testimony from Mr. Boyd, offered by the plaintiff and having heard the testimony of Mr. Wilson, an employee of the defendant denying that he made such a statement, they should determine whether the statement was made by the conductor of the train, and if they held that it had been made, they could consider it on the issue of liability, but they should disregard the statement entirely and expunge it in every way possible from their minds, if either they should find that no such statement was made or if they should

find that no such statement was made by a Railroad employee who was responsible for the movement of the train. The defendant requested no special instruction with respect to the derogatory racial remark, and none was given. As noted in Weinstein on Evidence:

> Since the trial judge is granted such a powerful tool by Rule 403, he must take special care to use it sparingly. The trier must rely primarily on the lawyer for decisions on what evidence will be useful to him.... If there is doubt about the existence of unfair prejudice, confusion of issues, misleading, undue delay, or waste of time, it is generally better practice to admit the evidence taking necessary precautions by way of contemporaneous instructions to the jury followed by additional admonition in the charge.

Weinstein's Evidence 403–7.

 We believe that the defendant's contention that such a remark if made by the conductor, was irrelevant to the issue of negligence cannot be sustained. The engineer testified that he was in charge of the train. He testified that he was an expert on judging the speed of the train. He testified that the prescribed speed limit by the railroad at this site was 47 miles per hour. There was ample evidence from which the jury could have found that the train at the time of the accident was traveling at more than 55 miles per hour. Since, the jury could have found that it was the responsibility of the conductor to call the engineer on his radio and have him slow the train down if in fact it was violating its own speed limits, we think the jury could infer from such a statement, if made, negligent conduct on the part of the Railroad at such a time and place.

Whether the racial word used should have been excluded on the ground that "its probative value is substantially outweighed by the danger of unfair prejudice ..." F.R.Ev. § 403 is a matter confided to the discretion of the trial court. However, the court could not exercise such discretion unless an objection of some kind was filed by the party relying upon the Rule. Here, no such objection or motion was made to the court. If, in fact, the jury concluded that the conductor had made such a statement, we are not convinced that for the statement to have been repeated to the jury in the exact terms used, would be error, even though called to the attention of the trial court. Witnesses are not infrequently called on to repeat ugly and profane statements made by others. This does not mean that they should avoid telling the exact truth from the witness stand. We, of course, do not suggest that the jury did make such a finding.

We conclude that no reversible error occurred by the trial court's handling of this issue.

2. *The trial court's prohibition of defendant's referring in opening statement to Collins' admissions and refusing to allow the defendant to recall a medical witness*

This issue arose because Seaboard wished to introduce in evidence the tape recording of an interview held between its claims agent, Sandy, and Collins while he was in the hospital recuperating from the accident. He was released from this hospitalization in February, 1979. He returned, however, on May 14, 1979 for surgery involving a colostomy. He remained there with serious complications until August 27, 1979. On August 3, 1980, the trial court, upon application of the petitioner entered an order to the effect that Collins was incompetent to manage his own affairs and appointed J. Benjamin Kay, III, Esq. as guardian ad litem for the purpose of representing him in this litigation. There being some evidence of the lack of coherence in Collins' speech during his first hospitalization and a similar condition, coupled with a determination that he had suffered some brain damage by the time he became the patient of a Dr. Kmiecik during the second period of hospitalization, the appellee sought to prevent the introduction of the taped conversation between the claims agent and himself. In an effort to resolve this question, Seaboard moved the court *in limine* before the begin-

ning of the trial to permit the introduction of the tape. The trial court delayed a decision on this motion until he had had an opportunity to hear whatever medical testimony was to be introduced by the plaintiff.

In view of the court's uncertainty as to whether the tape would be admitted, its instructions to the parties included one that the tape recording should not be referred to by counsel for the Railroad in its opening statement to the jury. The trial commenced at about noon on May 4, 1981 and the plaintiff's case was concluded in the middle of the afternoon of May 5. At that time, the trial court entered a written order stating that the tape would be admitted in evidence.

The appeal here complains of the delay by the trial court in making its decision, necessitating its direction that the tape not be mentioned in the opening statement. It also complains of the fact that, although Dr. Kmiecik, who was the general internist supervising the plaintiff's condition during his second stay in the hospital and subsequent thereto, had been examined by the plaintiff and cross-examined by the defendant as to his knowledge relating to the mental competence of the plaintiff, the court refused to permit the defendant to recall Dr. Kmiecik for further examination after the tape had been introduced.

■ First, with respect to the trial court's postponement of its decision as to the admissibility of the tape, we have no doubt about the propriety of the court's action. The court had heard none of the testimony dealing with the physical condition of the plaintiff during either his first or second period of hospitalization and, as the court itself said when asked whether it had made a ruling on the tape recording in light of Dr. Kmiecik's testimony: "No, because the plaintiff's evidence isn't closed, but I have been listening attentively to every bit of medical testimony that deals with competence and his ability with a view toward applying that test of minimum credibility." The conduct of the trial court with respect to this matter was not in error.

The answer to the second of these two issues requires a more careful analysis of what transpired at the trial. Dr. Kmiecik was first called to the witness stand for the plaintiff in order to outline the patient's physical condition at the time of the trial. He had seen him for two or three days at the time of the first admission, but had formed no opinion at that time concerning his mental competence. His testimony as to the time of the treatments given him during his second admission hardly dealt with his mental competence until the cross-examination on behalf of the defendant. During such cross-examination, Dr. Kmiecik stated several times that he was not aware of anything connected with Collins' mental capacity prior to the time he saw him beginning May 14, 1979. He testified that he answered simple questions during that hospitalization. The following exchange took place:

Q: And during those periods of time you have conversed with Mr. Collins, is that correct?

A: I have talked to Mr. Collins. His thinking ability is not that good that one can truly converse with him and carry on a good conversation. In other words, he will answer simple questions and that's about all.

Q: Is he able to give the correct answer to a lot of these questions?

A: I would say he gives the appropriate answer, but the questions are simple questions such as how do you feel.

Q: Is he oriented to where he's at, the place where he's at?

A: He appears to be oriented as to where he's at.

Q: Is he oriented to time?

A: As to whether he's truly oriented to time, I don't know.

Q: You're not aware of any memory problems that Mr. Collins had prior to this accident?

A: No, I'm not.

Q: In fact, you're not aware of any memory problems he had prior to his second hospitalization in May of 1979, are you, sir?

A: That is correct.

The cross-examination concluded with the following exchange:

Q: So you don't know anything about his mental condition prior to the time you saw him in May, is that correct?

A: That is correct.

Q: And you don't know whether he is more coherent as to time and place at that time than he is now?

A: That's correct.

Thereupon, the redirect examination undertook to show some possible connection with the loss of oxygen to the brain during the initial hospitalization. This short redirect examination ended as follows:

Q: And this hemaletic anemia, was there some indication of that during his first hospitalization?

A: There was an indication from the medical record that there were problems in that regard.

Q: Would this likewise result in a lack of sufficient oxygen to the brain?

A: Yes.

Q: Would this have any effect on the brain?

A: Yes.

Q: Would it be detrimental?

A: Yes.

The witness was then subjected to re-cross-examination, which was simply a repeat of what had already been asked on cross, so far as relates to Collins' mental status prior to May, 1979.

Thereupon, in the absence of the jury, the court questioned Dr. Kmiecik more fully, including the following questions and answers:

THE COURT: Which is more probable in your medical opinion, that Arthur Collins suffered one stage of mental deterioration at the time of his trauma or at the time of his second hospitalization or that he suffered a deterioration in two stages?

THE WITNESS: My medical opinion would be that it would be a two-stage type thing. There might have been some first, but it would be very reasonable to think that the problems during the second hospitalization would have contributed further to his mental deterioration, if any were in existence beforehand, which I don't know for sure.

The court then asked: "Do you have some psychiatric training?" and the witness responded: "Not formal, just ongoing, as a physician, to render a specific psychiatric opinion or psychiatrist opinion as to the complete competency, I don't think that would be appropriate on my part."

The court then took a recess during which Dr. Kmiecik was given an opportunity to listen to the tape recording. The court then permitted counsel to ask him further questions. In response to one, counsel for the defendant then asked him:

Dr. Kmiecik, I believe during the break you had an opportunity to listen to the tape recording and in your opinion, does Mr. Collins respond to the questions and answer the questions as fully today as he did back then?

The witness responded:

In my opinion he could not do as well as he did in January of 1979.

Thereafter, the court asked the witness again: "Do you mean that you still think the diminution of capacity came in two stages?" and the witness answered: "Definitely, from what I heard on the tape and what I subsequently now know, I would say the consequences of the events of the second hospitalization contributed to his current mental state."

Thereafter, the following transpired:

THE COURT: All right, thank you. Mr. Long, I'm not going to take that testimony at this time before the jury. I have not made yet a determination as to whether or not the tape will be admitted, but if it is admitted and if an issue is made of his competency at the time, if it is attacked, of course, you will be allowed to offer evidence supporting his competency.

The record is clear on the transcript of the several sidebar conferences that counsel for the defendant fully recognized that he would not be permitted to recall Dr. Kmiec-

ik for further cross-examination to bolster the argument that Collins was mentally competent when interviewed by the claims agent unless the plaintiff brought forward medical evidence tending to prove his incompetence. Upon the opening of the defendant's case, the personnel manager of the company Collins worked for, a man named Danzlier, was questioned about visiting with Collins during his first stay at the hospital. After Danzlier had testified that he had seen Collins several times during his first hospitalization, between the two periods of hospitalization, and after the second stay, and stated that he appeared normal during and after the first stay in the hospital, but he showed a loss of ability to communicate after the second period of hospitalization Counsel asked him exactly what "Mr. Collins told you about the collision."

Thereupon, counsel offered the following objection:

> May it please the Court, I would object to that question of this witness on the grounds that this Court by an order previously entered in this case and on file has found that Arthur Collins was incompetent from the time of the collision. He has been examined by two psychiatrists, both of whom found that he was incompetent and their medical opinion, relating to the issue of his competency is in the court files and we think any statements made by Mr. Collins, while he was in the hospital, at the time these doctors felt he was incompetent would be inappropriate, unreliable and would not be an appropriate matter for consideration by the jury in this case. On those bases we would object.

The appellant seizes on this objection by counsel for Collins as if it were affirmative proof by the plaintiff of Collins' incompetency at the time the statement was made. The defendant, therefore, requested the right to recall Dr. Kmiecik. The following occurred:

> MR. LONG: Last night, Your Honor, you ruled that if nothing relating to Mr. Collins' competency was brought out by the Plaintiff, I would not be able to use Dr.

Kmiecik's testimony in our case. Mr. Burnside's objection I believe brought that issue back in front of the jury and I think I would be entitled at this time to bring Dr. Kmiecik back.

THE COURT: I said I would give the appropriate instructions, as you requested, about the determination of competency at the time, again, basically to the effect that the jurors would make their own determination in that regard. I don't view his merely stating the grounds for his objection, as having been an attack on the competency.

MR. LONG: I would ask that any objections he makes along that line be made outside the presence of the jury.

I believe his objection made mention of a psychiatrist who testified, who has not testified.

. . . . .

MR. BURNSIDE: If the Court will tell me I will have a standing objection, it's agreeable with me, not to say anything.

THE COURT: That's fine.

■ We conclude that the trial court adhered strictly to its own promise to permit further testimony by Dr. Kmiecik only in case the plaintiff produced medical evidence of the plaintiff's incompetence at the time he made admissions against his interest. Furthermore, we are satisfied that the trial court correctly observed that, because of the lack of training by Dr. Kmiecik in matters relating to psychiatry, the court and jury had received all of the worthwhile evidence that he could give on the subject of the plaintiff's mental capacity at the time of his interviews with Sandy and Danzlier. Besides that, the evidence given by Danzlier was so full and explicit as to the ability of Collins to communicate fully and freely after the date of the Sandy interview, any error made by the trial court, if any existed, in refusing to permit a recall of Dr. Kmiecik after direct, cross, redirect, and recross examination would be harmless error.

3. *Alleged error in admitting evidence of subsequent collisions at the scene of the accident without a showing that the crossing and scene were unchanged and where "evidence" was pure hearsay*

During the cross-examination of the engineer and other trainmen, the witnesses were asked if they had knowledge of other accidents or "near misses" at the crossing in question. Counsel for the defendant objected and stated: "We would ask that it be limited to times and occurrences prior to the collision at issue here. I don't think that anything that happened after this collision is relevant, as far as this particular crossing is concerned."

Counsel then objected on the ground that the question called for a hearsay response, unless restricted to matters the witness himself had observed. The witness then answered: "I have heard of them, but I haven't seen them."

Subsequently, before the next witness was called, counsel for the defendant Railroad made a motion *in limine*, requesting that the court recognize a continuing objection to testimony relating to accidents which might have occurred subsequent to the date of the accident in litigation. This objection was in the following terms:

Judge, I would like to move, outside the presence of the jury, we have motion *in limine* to limit Mr. Burnside (plaintiff's counsel) to bringing up anything about collisions that occurred subsequent to October 30, 1978. I think it's highly prejudicial, irrelevant and has nothing to do with this case.

The court overruled the objection and the conductor was permitted to answer questions by plaintiff's counsel as follows:

Q: There have been a number of near misses at the Claussen Road crossing, have there not?

A: In numbers, I don't know of numbers, there have been near misses.

Q: You wouldn't estimate how many?

A: No.

Q: And there have been a number of wrecks at the Claussen Road crossing?

A: I've been involved in one.

Q: And That was the one that Arthur Collins was involved in?

A: Yes.

Q: But you are aware of the fact that there have been other wrecks involving Seaboard Coastline trains at the Claussen Road crossing?

A: I have heard of other wrecks being there.

Finally, when the Railroad's claim agent was on the witness stand subject to cross-examination, he was asked how many accidents at this crossing he had investigated "in the last three years." Whereupon, counsel for the defendant stated: "I would renew my objection." Thereupon, the witness answered: "Three to four."

Upon further examination, he testified that he had a personal recollection of one in '81, one in October of '80, one in '79, one in '78, and one seven years ago.

Appellant criticizes the court's overruling its objection to the admission of this testimony on two grounds. The first is that, whether or not before the Collins accident occurred it was irrelevant; second, if it occurred after the Collins accident, it was irrelevant; and third, it was subject to the rule against allowing the admission of hearsay evidence.

■ Dealing with these matters in reverse order, the hearsay objection was made only as to the evidence of accidents occurring before the Collins accident. The continuing objection made no reference to the hearsay ground. Since the jury could consider the knowledge that the Railroad employees had of the occurrence of accidents at this crossing as notice of the crossing's dangerous characteristics, the evidence would not be hearsay. This Court has held that evidence showing the nature of a railroad crossing prior to the occurrence of a particular accident is admissible to show notice of the railroad as to the existing dangerous condition. *Young v. Illinois Central Gulf R. R. Co.*, 618 F.2d 332 (5th Cir. 1980); *Bailey v. Southern Pacific Trans.*

*Co.,* 613 F.2d 1385 (5th Cir. 1980). So much is conceded by the appellant. The fact that the Railroad's employees had not personally witnessed the accidents which they stated they had heard about does not turn this evidence into hearsay. The fact of their hearing about such accidents, later shown to have occurred, was relevant to the issue of notice.

■ With respect to the question whether the trial court erred in permitting testimony dealing with acts that occurred subsequent to the Collins accident, we face a different problem. Clearly, the objection to the hearing of *any* testimony dealing with subsequent actions was too broad. The court would have been in error had it refused to permit counsel for the plaintiff to bring "up anything about collisions that occurred subsequent to October 30, 1978", which was the objection made *in limine* as a continuing objection. Appellant concedes that it would be permissible for the court to have permitted evidence of subsequent events if a showing had been made that conditions were shown to be similar. *See Wright v. Dilbeck,* 122 Ga.App. 214, 176 S.E.2d 715 (1970) (a case cited by the appellant). Here, if the court had sustained the continuing objection, it would have been impossible for the plaintiff to have shown occurrences since the date of the Collins accident, even by showing that there had been no changes in conditions. Whether the trial court intended to place the burden on the defendant to show that there had been changes in conditions or overlooked the limitation on the admissibility of such after-occurring events is not clear. However, the burden was on the objecting party to so limit his objection as to permit the court to rule precisely on an objection correctly stated. F.R.Ev. 103(a)(1). Here, at no time did appellant move to limit plaintiff's proof of post-occurrence accidents to occurrences which occurred under similar conditions.

We conclude, therefore, that the trial court committed no reversible error in not sustaining these objections.

**4. *Alleged error in allowing the so-called "human factors" expert to testify on matters not properly the subject of expert testimony***

The plaintiff called as a witness to support its contention that the site of this accident was a dangerous railroad crossing, Frank Fowler, whom the defendants characterize as a "so-called 'human factors' safety expert." In fact, the record amply shows that Fowler's experience and expertise extended to the investigation of several hundred grade crossing accidents, and that he had been engaged by private industry and others to make recommendations with respect to corrective measures. The defendant did not seriously attack the expertise of Fowler, but contends that expert opinion "was improper on the matters sought to be discussed, such as the reasonable safe speed limit and the degree of danger at a particular crossing."

Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence *or to determine a fact in issue* a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. (Emphasis added.)

The appellant in its brief, dealing with its contention that it should have the right further to cross-examine Dr. Kmiecik made the following statement as to the power of the district court with respect to permitting expert testimony:

Admission of expert testimony is within the discretion of the district court and will be reversed only for abuse of discretion.

Citing *Bauman v. Centex Corp.,* 611 F.2d 1115, 1120 (5th Cir. 1980). The *Bauman* case does support the statement made by appellant.

Moreover, we note a subsequent case that clearly indicates this Court's liberal construction of Rule 702 in cases such as that now before the Court:

Mr. Williams is a civil engineer with over 30 years experience in building and supervising the construction of highways. There was no question of his competency to testify as an expert in this case. His testimony, *including his assessment of the danger of this particular crossing, should have been admitted.* We agree with the following assessment made by the Sixth Circuit on this very question:

It is absurd to contend that the average layman has, as a matter of common knowledge, a sufficient grasp of the diverse factors which must be considered in constructing and maintaining an acutely angled railroad crossing which will afford a maximum of safety and a minimum of inconvenience to vehicular traffic and train movement.

*Bridger v. Union Railway,* 355 F.2d 382, 389 (6th Cir. 1966), see Fed.R.Evid. 702. The trial court erred in not allowing Mr. Williams to testify about the condition of the crossing. [Emphasis added.]

*Young v. Illinois Central Gulf R. R. Co.,* 618 F.2d 332 at 338.

In light of this opinion by the Court of Appeals for the Fifth Circuit[3] this ground of appeal appears to be frivolous.

5. *Alleged error in allowing plaintiff to read into evidence requests for admissions propounded by Seaboard to Collins, and Collins' responses thereto*

During the discovery phase of the case, the Railroad submitted a long number of requests for admissions to Collins. Included in these were the following:

9. Mr. Collins stopped at the stop sign at the intersection of Claussen Road and Murray Road.

35. The train speed prior to the application of brakes as the train approached the intersection with Claussen Road was 55–60 miles per hour.

36. The train's speed prior to the application of brakes as the train approached the intersection with

Claussen Road was greater than 60 miles per hour.

The responses by the plaintiff to the request for admission of the indicated paragraphs are as follows:

9. Admitted.

35. J. Benjamin Kay, III, as guardian ad litem for the plaintiff Arthur Collins, an incompetent, in response to the defendant's request for admission number 35 admits that the train speed prior to the application of brakes as the train approached the intersection with Claussen Road was in excess of 55 miles per hour but for want of sufficient information on which to form a belief can neither admit nor deny that the train speed was less than 60 miles per hour.

36. Plaintiff, through J. Benjamin Kay, III, guardian ad litem for the incompetent plaintiff Arthur Collins, admits for the purposes of this litigation, and will not controvert defendant's request for admissions number 36, that the train speed prior to the application of brakes as the train approached the intersection with Claussen Road was greater than 60 miles per hour.

During the trial, plaintiff tendered in evidence these "admissions" prepared on behalf of plaintiff by his guardian ad litem. By pretrial motion, the guardian ad litem had submitted his answers to the requests for admissions served on him by the defendant and had requested the court to permit him to make the answers to the extent of his ability in light of information which he had obtained dealing with the requests for admissions. The court entered an order stating:

Rule 36(b) of the Federal Rules of Civil Procedure states that a matter admitted is "conclusively established." To the extent provided by this Rule, plaintiff's motion is granted. Defendant, however, is

**3.** This Court considers the opinions and decisions of the Court of Appeals for the Fifth Circuit as binding precedent unless and until overruled by this Court en banc.

free to produce other evidence contradicting the facts contained in the responses. C. Wright & A. Miller, Federal Practice and Procedure, Civil, § 2264.

Subsequently, defendant filed its motion requesting the court to permit it to withdraw its request for admissions. The trial court denied this request, stating that there was no basis for allowing it under the Rule and further stated: "On December 31, 1980, the court allowed admissions made by plaintiff's guardian ad litem. In its order, the court clearly stated that defendant was free to produce evidence contradicting these admissions." And, further, "Defendant is still free to produce evidence contradicting the admissions, but its motion to withdraw the request for these admissions is hereby denied."

Thus, the court made it plain that it was not admitting the answers to the requests for admissions as conclusively establishing the facts stated.

Upon the motion by plaintiff to tender the admissions in evidence, the defendant objected to their admission, on the ground that it contended that they were not "binding" on the propounder of the requests. The objection stated: "We think it would be in error for the court to hold any question, we ask, in a request for admission *as being an admission* on the part of the defendant" [emphasis added] and again, "I don't believe when we ask somebody to admit something in a series of questions, that our questions bind us."

Thus, it is clear that no objection was made to the trial court except that the answers to the requests should not be considered binding on the propounder of the requests. There was no objection made on the ground that the answers were hearsay or were in any other way objectionable.

We need not reach the question whether, if proper objection had been made, these "admissions" could properly be received in evidence. An argument could well be made that, since they take the place of the cross-examination of an opposing witness (the party himself) the propounder of the question ought to be "stuck" with the answer or,

if the filing of a request for admissions and the responses thereto are to be considered somewhat in the nature of the pleadings in the case, an equally fair argument could be made that the party who asserts the fact as to which he requests a response from his opponent should be bound as much as if he had amended his pleadings to include the propounded statement. For a full discussion of the use and effect of requests for admissions, *see* Wright & Miller, § 2264.

■ Even if we were to hold that the admission into evidence of these answers was error, even though no proper objection had been made thereto, we would find that such error was harmless to the defendant. It is hard to conceive of the jury's paying much attention to an answer which showed on its face that it was made by a guardian ad litem who obtained his information from discussion with other persons and who concluded that he would admit that the train was going at a rate of 55 to 60 miles an hour when it already had heard witnesses from the stand testify to the same facts. The jury, of course, also had before it sworn testimony by three railroad trainmen that the train was not going in excess of 40 miles an hour.

We conclude that the trial court did not commit reversible error by the admission of these answers to the request for admissions.

6. *The alleged error in admitting evidence of Collins' blood alcohol tests when his sobriety was not in issue*

■ Seaboard objected to the introduction by the plaintiff of documents which showed the results of a blood alcohol test of the plaintiff following the accident. The trial court, considering that if Collins had been competent to testify and had been on the witness stand he would have been permitted to testify as to the condition of his health and his feelings at the time of the accident, concluded that it was appropriate, in the absence of Collins as a witness to admit evidence concerning the state of his sobriety at the time he was struck by the train. We agree that this was not error in

light of the fairly broad discretion in the trial court in ruling on relevance and admissibility of evidence. *See United States v. Medel,* 592 F.2d 1305 (5th Cir. 1979) and *United States v. Linetsky,* 533 F.2d 192, 204 (5th Cir. 1976).

### 7. Denial of motion for new trial

[8] The Court of Appeals for the Fifth Circuit, by whose decisions this Court is bound until and unless overruled by an en banc decision of this Court, has set the standard by which we review the denial by the trial court of a motion for new trial.

> On appeal, when we review the denial of a motion for a new trial, we are not reviewing "sufficiency" in its technical sense; that is, we are not reviewing the question of whether it was erroneous to submit the case to the jury. Rather, we are reviewing whether the district judge has abused his judicial discretion in denying a new trial or whether as a matter of law the denial of a new trial was erroneous because there was an "absolute absence of evidence to support the jury's verdict." *Indamer Corp. v. Crandon,* 5 Cir. 1954, 217 F.2d 391, 393 . . . .

*Urti v. Transport Commercial Corp.,* 479 F.2d 766, 769 (5th Cir. 1973). We, of course, cannot say that there was an absolute absence of evidence to support the jury's verdict in this case. In addition to the testimony of the expert witness as to the dangerousness of the crossing, the lack of the effective whistle and his opinion as to the maximum appropriate speed at this crossing, there was direct evidence that the train was traveling in a close proximity to the accident at a speed of 57 miles per hour, at a point when its own speed limit was 47 miles per hour. These circumstances were sufficient to have permitted a jury to find in favor of the plaintiff. We cannot hold that the trial court abused its discretion in denying the motion for a new trial.

### III. CONCLUSION

A careful reading of the transcript in this case has demonstrated to our satisfaction that the trial court took meticulous efforts to afford the parties a fair trial. Numerous discussions were held on objections out of the presence of the jury. In fact, it appears that each time counsel requested proceedings *in limine* the court acquiesced. As the Supreme Court has stated, even in the trial of criminal cases as to which all courts are more concerned with the absence of protection of the parties' rights: "A defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953) *and see United States v. Evans,* 572 F.2d 455 (5th Cir. 1978). We conclude that if any errors were made with respect to receipt of exclusion of evidence they were harmless in view of other factors as discussed.

The judgment is AFFIRMED.